WMP:JPL/LRT/JPM/JPL
F.# 2016R01586

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

SAMUEL MEBIAME,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

INFORMATION

Cr. No. _16 - 627 (NGG)_
(T. 18, U.S.C., §§ 371 and 3551 et seq.)

THE UNITED STATES CHARGES:

    At all times relevant to this Information, unless otherwise stated:

## THE DEFENDANT AND REFERENCED INDIVIDUALS AND ENTITIES

    1.    The defendant SAMUEL MEBIAME was a Gabonese citizen.

    2.    Co-Conspirator #1 ("CC-1"), an individual whose identity is known to the United States, was a South African national.

    3.    The "Turks & Caicos Entity," a corporation whose identity is known to the United States, was incorporated in the Turks & Caicos Islands on or about September 8, 2003, by agents acting on behalf of CC-1.

    4.    The "Mining Company," a corporation whose identity is known to the United States, was incorporated in the British Virgin Islands.  The Mining Company had been active in Africa since at least 2005.  The Turks & Caicos Entity owned a controlling interest in the Mining Company.

1

5.     The "Turks & Caicos Subsidiary," a corporation whose identity is known to the United States, was incorporated in the British Virgin Islands on or about April 19, 2007, by agents acting on behalf of CC-1.

6.     The "Joint Venture" was formed in or about 2007, between the Turks & Caicos Subsidiary and a wholly owned subsidiary of Och-Ziff Capital Management Group LLC, a U.S. hedge fund, to invest in African mining, oil and mineral concessions.

7.     Niger Official #1, an individual whose identity is known to the United States, was a senior official in Niger who was married to Niger Official #2.   Niger Official #1 was a "foreign official" as that term is defined in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-3(f)(2)(A).

8.     Niger Official #2, an individual whose identity is known to the United States, was a senior official in Niger who had the ability to take official action and exert official influence over mining matters in Niger.   Niger Official #2 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

9.     Niger Official Intermediary #1, an individual whose identity is known to the United States, was the nephew of Niger Official #1 and Niger Official #2.

10.     Niger Official Intermediary #2, an individual whose identity is known to the United States, was the son of Niger Official #1 and Niger Official #2.

11.     Niger Official Intermediary #3, an individual whose identity is known to the United States, was the family lawyer for Niger Official #1 and Niger Official #2.

12.     Chad Official #1, an individual whose identity is known to the United States, was a senior official in Chad who had the ability to take official action and exert official

2

influence over mining matters in Chad. Chad Official #1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

13. Guinea Official #1, an individual whose identity is known to the United States, was a senior official in Guinea who had the ability to take official action and exert official influence over mining matters in Guinea. Guinea Official #1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

14. Guinea Official #2, an individual whose identity is known to the United States, was a senior official in Guinea who had the ability to take official action and exert official influence over mining matters in Guinea. Guinea Official #2 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

## THE FOREIGN CORRUPT PRACTICES ACT

15. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

## THE BRIBERY SCHEME

16. The defendant SAMUEL MEBIAME worked on behalf of the Joint Venture, the Turks & Caicos Entity and the Mining Company as a "fixer" to obtain rights to mineral concessions in various African countries by routinely paying bribes to foreign government officials. MEBIAME bribed officials in, among other countries, Niger, Chad and Guinea. MEBIAME personally took numerous steps while in the United States in furtherance of the scheme, including, but not limited to, sending and receiving email and other

3

communications with co-conspirators about the corrupt scheme, receiving payments related to the corrupt scheme into U.S. bank accounts he established and meeting with co-conspirators to discuss the corrupt scheme.

17.     For example, in or about and between June 2007 and November 2012, the defendant SAMUEL MEBIAME worked to obtain and retain rights to uranium mining concessions in Niger.   In connection with his efforts, MEBIAME caused corrupt payments to be made to Niger Official #1 to obtain Niger Official #1's influence over Niger Official #2, who had the power to grant uranium mining licenses to the Mining Company and the Joint Venture. The corrupt payments included, among other things: cash payments directly to Niger Official #1; payments for "nice cars;" a $100,000 payment to a charity run by Niger Official #1; and cash and wire transfer payments made to and through Niger Official Intermediary #1, Niger Official Intermediary #2 and Niger Official Intermediary #3.

18.     In addition, in about and between January 2007 and June 2008, the defendant SAMUEL MEBIAME worked to obtain the rights to uranium concessions and other natural resource opportunities in Chad.   In connection with his efforts, MEBIAME paid bribes to Chad Official #1 to obtain the uranium concessions on behalf of the Mining Company and the Joint Venture.   MEBIAME gave Chad Official #1 cash and paid for travel expenses and shopping excursions for Chad Official #1 and Chad Official #1's spouse in Paris, France.

19.     Furthermore, in or about and between June 2010 and June 2012, MEBIAME engaged in negotiations for mineral rights and opportunities on behalf of CC-1 and the Turks & Caicos Entity, including the opportunity to be partners with a Guinean state-owned mining company (the "SOMC").   The defendant SAMUEL MEBIAME had special access to

4

mining opportunities in Guinea because of payments he provided to senior government officials in Guinea in exchange for such access.  For example, in 2010, MEBIAME provided an S-class Mercedes Benz sedan to Guinea Official #1 while he was a candidate for office.  On or about March 15, 2011, MEBIAME arranged to pay $440,000 to rent a private Airbus jet for Guinea Official #1's use.  MEBIAME's financial support to Guinean officials included, but was not limited to, approximately $100,000 to $200,000 in cash payments provided by MEBIAME to Guinea Official #2.  In return, Guinea Official #2 arranged a secret meeting with the heads of the SOMC and provided MEBIAME secret information, which provided MEBIAME leverage in negotiations with the government.

CONSPIRACY

20.    The allegations contained in paragraphs one through 19 are realleged and incorporated as though fully set forth in this paragraph.

21.    In or about and between January 2007 and June 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SAMUEL MEBIAME, together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit: while in the territory of the United States, to corruptly make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official for purposes of (a) influencing any act and decision of such foreign official in his official capacity, (b) inducing such foreign official to do and omit to do any act in violation of the lawful duty of such official, (c) securing any improper advantage, and (d) inducing such

5

foreign official to use his influence with a foreign government and instrumentality thereof to affect and influence any act and decision of such government and instrumentality, in order to assist Co-Conspirator #1, an individual whose identity is known to the United States, in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-3(a)(1).

22.    In furtherance of the conspiracy and to achieve the objects thereof, the defendant SAMUEL MEBIAME, together with his co-conspirators, committed or caused to be committed, among others, the following:

<u>OVERT ACTS</u>

a.    On or about September 18, 2007, a co-conspirator sent an e-mail to MEBIAME, which stated: "No one is disputing [a co-conspirator's] role in facilitating initial contact with the Chadian government – for which a consideration was advanced to him and [Chad Official #1]."

b.    On or about August 5, 2011, MEBIAME, while he was in the United States, received a telephone call from a co-conspirator who asked MEBIAME to travel to Niger to meet with Niger Official #2 and propose a partnership between the Turks & Caicos Entity and the Nigerian state-owned mining company.

c.    On or about August 6, 2011, MEBIAME, while in the United States, sent an e-mail to CC-1, which concerned meetings with Guinea Official #1 and the Guinean Minister of Mines.

d.    On or about September 22, 2011, MEBIAME traveled from Paris, France to John F. Kennedy International Airport ("JFK"), located in Queens, New York to meet

with CC-1, together with others, to discuss Niger, MEBIAME's role in the conspiracy going forward and the role of Niger Official Intermediary #1.

    e.  On or about September 22, 2011, while in New York, MEBIAME forwarded multiple e-mails related to the Niger mining licenses to a co-conspirator.

    f.  On or about September 28, 2011, CC-1 caused a wire transfer of $20,000 to a bank account in the United States opened by and for the benefit of MEBIAME.

    g.  On or about November 9, 2011, CC-1 caused a wire transfer of $82,200 to a bank account in the United States opened by and for the benefit of MEBIAME.

    h.  On or about March 21, 2012, CC-1 caused a wire transfer of $60,000 to a bank account in the United States opened by and for the benefit of MEBIAME.

    i.  On or about April 17, 2012, MEBIAME sent an e-mail to a co-conspirator, which asked the co-conspirator to transfer "fees" for MEBIAME's work in Guinea on behalf of the conspiracy.

    j.  On or about April 23, 2012, CC-1 caused a wire transfer of $64,710 to a bank account in the United States opened by and for the benefit of MEBIAME.

    k.  On or about May 28, 2012, while in the United States, MEBIAME received an e-mail from CC-1's personal assistant, which included an earlier e-mail that was originally addressed to CC-1 and another co-conspirator. The forwarded e-mail concerned a bet

7

for a watch between CC-1 and the co-conspirator as to whether the United States could assert

jurisdiction under the FCPA solely based on the use of correspondent banks in the United States

to clear transactions denominated in U.S. Dollars.

(Title 18, United States Code, Sections 371 and 3551 et seq.).

Dated: Brooklyn, New York
       December __, 2016


_____        _____
ROBERT L. CAPERS                            SANDRA L. MOSER
United States Attorney                   Principal Deputy Chief
Eastern District of New York         Criminal Division, Fraud Section