UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                               :

UNITED STATES OF AMERICA         :

                               :

              v.                :      16 CR 627 (NGG)

                               :

SAMUEL MEBIAME             :

                               :

-------------------------------------------------------------X

**SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF SAMUEL MEBIAME**

Larry H. Krantz, Esq.
**Krantz & Berman LLP**
747 Third Avenue, 32nd Floor
New York, NY 10017-2803
(212) 661-0009

*Attorneys for Samuel Mebiame*

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................... 1

I.      Mr. Mebiame's Background ...................................................................... 2

II.     Mr. Mebiame's Arrest and Pre-Arrest Meetings With The Government ..................... 3

III.    Considerations Warranting A Reduced Sentence ......................................... 6

        1.   Mr. Mebiame's Pre-Arrest Meetings With The Government ............... 7

        2.   The Circumstances of Mr. Mebiame's Arrest And His Time
             in Custody ............................................................................. 8

        3.   Mr. Mebiame's Early Plea and Acceptance of Responsibility ............. 9

        4.   Mr. Mebiame's Role In The Larger Investigation ................................ 9

        5.   The Advisory Guidelines Overstates the Seriousness of
             Mr. Mebiame's Conduct ............................................................ 13

        6.   Mr. Mebiame Has Already Been Incarcerated for Almost
             9 Months, and As a Foreign National, Will Serve a Longer and
             More Severe Sentence than Would a Citizen ........................................ 16

        7.   The Need to Avoid Unwarranted Disparities Among Similarly
             Situated Defendants ............................................................... 17

        8.   Mr. Mebiame's Character and History ................................................ 21

             a.   The Impact of Mr. Mebiame's Arrest on His Daughter.................. 21

             b.   Mr. Mebiame's History of Good Deeds, Including Working
                  To Release French Foreign Nationals Held in Niger in 2008 ......... 22

             c.   Mr. Mebiame's History, Character and Charitable Acts ................ 23

IV.     Additional Sentencing Recommendation ..................................................... 28

**Preliminary Statement**

This memorandum is respectfully submitted on behalf of Samuel Mebiame, who is currently scheduled to be sentenced on April 27, 2017.  Mr. Mebiame previously pleaded guilty to a one count Information charging him with conspiring to violate the FCPA, and faces a statutory maximum of five years imprisonment.  Of course, since there is no mandatory minimum and the sentencing guidelines are advisory only, this Court is free to sentence Mr. Mebiame to any appropriate sentence between 0-5 years.   Mr. Mebiame has already served almost nine months in custody at the Metropolitan Detention Center (MDC).

Without in any way minimizing the seriousness of the FCPA offense for which Mr. Mebiame has pleaded guilty, we respectfully submit that a sentence of time served is fair and appropriate given the unique circumstances presented here.  Indeed, given the time that Mr. Mebiame has already spent in custody since his arrest, a sentence of time served would be the approximate equivalent of a sentence of one year and a day.  We respectfully submit that such a sentence is "sufficient but not greater than necessary" to achieve the statutory purposes of punishment as required by 18 U.S.C. § 3553(a).

Among the reasons why believe that such a sentence is fair and appropriate are:

- Mr. Mebiame's voluntary pre-arrest meetings with the Government, which meetings formed the principal evidence offered against him, and provided the Government with background information that was of value to it;
- The nature and circumstances of Mr. Mebiame's arrest, which involved him traveling voluntarily to New York to meet with the Government, at which time he was arrested;
- Mr. Mebiame's early plea and acceptance of responsibility;
- Mitigating factors concerning the offense conduct, including the fact that Mr. Mebiame is, thus far, the only person to be arrested in connection with Och-Ziff's scheme to bribe foreign officials, and the fact that his sentence should reflect his lesser culpability compared to the other participants who may later be charged with conspiracy to violate the FCPA (or whom may never be charged at all);
- The draconian nature of the advisory sentencing guidelines in a case such as this;

1

- The need to avoid sentencing disparities among other defendants convicted of FCPA violations in unrelated cases;
- The fact that, as a foreign national, if Mr. Mebiame is sentenced to an additional prison term he will be ineligible for early release and will serve that time under harsher conditions than other similarly situated defendants who are not foreign nationals (since he is ineligible for designation to a "camp" facility);
- The effect that further incarceration will have on Mr. Mebiame's young daughter; and
- Mr. Mebiame's otherwise good character and history of good deeds.

We ask that the Court take all of these factors into consideration in determining what is a fair and just sentence for Mr. Mebiame.  We trust that in evaluating these factors the Court will temper justice with mercy, and we urge the Court to reach the conclusion that Mr. Mebiame has suffered enough punishment already, and that the societal needs for punishment and deterrence have already been satisfied.

We elaborate on these sentencing factors below.  However, before turning to the 3553 factors, we briefly review Mr. Mebiame's background and the circumstances of his arrest.

## I.  <u>Mr. Mebiame's Background</u>

Mr. Mebiame is a 43 year old dual citizen of France and Gabon, which is a French equatorial country home to over forty ethnic groups.  He is the son of the former Prime Minister of Gabon, Leon Mebiame, who served as Vice President of Gabon from 1968 to 1975, and as Prime Minister from 1975 to 1990.  Prime Minister Mebiame later served in various official capacities before his death in 2015.

As noted in the PSR, Mr. Mebiame has no criminal history, and is thus a first-time offender.

Mr. Mebiame had both a charmed and a difficult childhood.  As the son of a prominent politician, his parents were occupied with matters of state, and so Mr. Mebiame was often left in the care of others and had little contact with his parents in his formative years.  Mr. Mebiame obtained his schooling in Gabon in his younger years, and then at a boarding school in Paris, and

finally in the United States.   Later in life, Mr. Mebiame formed a very close relationship with his father, who encouraged Mr. Mebiame to serve the Gabonese Government.  As an adult, he entered the business world and also served the Gabonese Government in several different capacities, with his father's encouragement.

While serving Gabon, Mr. Mebiame also married and had a daughter, Shekina, with his then-wife Latisha.   Shekina is now 13 years old.  Prior to his arrest, Mr. Mebiame was very involved in Shekina's upbringing.  In Gabon, when parents separate or divorce it is commonplace for the mother to be the custodial parent for the youngest years, and for the father to assume full custody of his children beginning at approximately age 12.  Accordingly, it was expected that Mr. Mebiame would take full custody of Shekina just around the time of his unexpected arrest.  Of course, his arrest upended these plans, and Shekina's life has been turned upside down.  Rather than living with her father, and attending school in Paris with her cousin (as was planned), she is living with her mother and attending school in Gabon, with absolutely no ability to have personal contact with her father. This has been devastating for Shekina and Mr. Mebiame.  In fact, Shekina has not been able even to speak with her father since his arrest approximately 9 months ago.

## II.    Mr. Mebiame's Arrest and Pre-Arrest Meetings With The Government

The extensive scope of the Government's investigation into alleged FCPA violations committed by key executives, officers and employees of Och-Ziff Capital Management (and related entities) in the United States, Europe, Africa and Libya for their own benefit and the benefit of their investors is well documented.   In September 2016 criminal and civil charges were filed and resolved against Och-Ziff and its related entities.  However, more than a year before the Och-Ziff resolution, Mr. Mebiame met twice with the Government in the course of its investigation of FCPA violations.

3

Specifically, on June 17, 2015, Mr. Mebiame was traveling from Paris, France to Miami, Florida.   At that time, the Government was aware that Mr. Mebiame was entering the country, and stopped him at the border.   Mr. Mebiame submitted to a voluntary interview with agents from the IRS and the FBI.  This meeting lasted approximately three hours, which Mr. Mebiame engaged in without the benefit of legal counsel, a proffer agreement, or any legal protections.   At the end of that meeting, Mr. Mebiame was permitted to continue to travel to Miami, and agreed to await further communication regarding a potential additional meeting with members of the Department of Justice.

A few days later, the agents contacted Mr. Mebiame and asked him to meet with prosecutors from the Department of Justice in the E.D.N.Y.  Mr. Mebiame agreed to this further meeting, and traveled to New York at the Government's expense.  On June 23, 2015, Mr. Mebiame met again for several hours (without counsel) with DOJ attorneys (including the prosecutors here) and Special Agents from a number of federal agencies.   As reflected in the PSR, much of the evidence against Mr. Mebiame came from "the defendant's own voluntary admissions to law enforcement officials," PSR ¶ 3, and "on June 17, 2015 and June 23, 2015, [when] the defendant met with law enforcement officials and made statements regarding his criminal conduct."  PSR ¶ 3.  Indeed, the Complaint in this case is rife with references to these meetings.   At the conclusion of this second meeting, Mr. Mebiame was permitted to travel back to Miami, and ultimately returned to Paris (where he was living at that time).

Over the course of the next year, Mr. Mebiame continued to live in Paris.  After almost a year, however, he communicated with the IRS and FBI agents and informed them that he was planning a return visit to the United States, and confirmed his continued willingness to meet with them.  Mr. Mebiame told the agents the details of his travel plans, including that he planned a trip

to Miami with his daughter and niece in July 2016.  The agents confirmed that the Government was interested in meeting with Mr. Mebiame in July or August.

In July 2016, Mr. Mebiame travelled to Miami with his young niece and 12 year old daughter, and spent time with them before his expected meeting with the Government.  He also provided the Government with the name and contact information of a US-based attorney whom the Government could speak to on his behalf.  Ultimately, given the gravity of the situation, that attorney asked the prosecutors for assurances that Mr. Mebiame would not be arrested at the upcoming meeting. The prosecutors, however, could not give such assurances. Notwithstanding this risk, Mr. Mebiame agreed to meet with the Government to discuss the matter further.  Thus, once again, on August 16, 2016, Mr. Mebiame voluntarily traveled to New York to meet with the Government (leaving his niece and daughter in the care of a nanny for the day).  However, when Mr. Mebiame arrived for the meeting, he was immediately arrested on a Complaint.  This left Mr. Mebiame in the precarious position of not being able to care for his minor niece and daughter whom he had brought to Miami.  Thankfully, the Government was courteous enough to afford Mr. Mebiame time to talk privately with his counsel and to make phone calls to arrange for the care of his daughter and niece, both of whom hastily ended their trip to Miami and travelled in short order back to Paris as unaccompanied minors.

Mr. Mebiame was taken into custody, and as a foreign national, was denied bail.  He has not spoken to or seen his daughter or any of his immediate family members since his arrest.  Indeed, he has had no visitors at MDC other than legal counsel.

Just a few months after his arrest on the Complaint, and even before the exchange of any discovery, on December 9, 2016, Mr. Mebiame entered a plea of guilty to a one count Information

charging him with conspiracy to violate 78dd-3(a)(1) of the FCPA. He has remained detained at MDC awaiting sentence by this Court.

## III.    Considerations Warranting A Reduced Sentence

As Your Honor is well-aware, the United States Sentencing Guidelines are merely advisory and the considerations identified in 18 U.S.C. § 3553 should be used to aid this Court's determination of an appropriate sentence. Moreover, Section 3553(a) requires that the Court impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in that section. 18 U.S.C. § 3553(a).

As reflected in the Information, the offense conduct in this case involves a conspiracy to offer and make payments to African officials in an effort to influence their official acts, as prohibited by 78dd-3 of the FCPA. While we do not minimize the seriousness of this offense, the circumstances of this case counsel strongly in favor of a sentence substantially below the statutory maximum of five years. Indeed, we respectfully submit that a sentence of time-served, which is the approximate equivalent of a sentence of a year and a day, is fair and appropriate based on the following considerations: (1) Mr. Mebiame's voluntary pre-arrest meetings with the Government, in which he incriminated himself and provided background information that was of value to the Government; (2) the circumstances of his arrest, which involved his sudden and unexpected incarceration in the U.S. and separation from his family; (3) Mr. Mebiame's early plea and acceptance of responsibility; (4) the fact that to-date Mr. Mebiame is the only individual who has been charged criminally in connection with the Government's larger investigation into Och-Ziff, and that even if others are charged (which may or may not occur), his sentence should reflect his significantly lesser role compared to the masterminds who executed a scheme that went well beyond Mr. Mebiame; (5) the fact that the advisory guidelines are not a good proxy for Mr. Mebiame's culpability; (6) the conditions and length of any additional incarceration due to Mr.

Mebiame's status as a foreign national; (7) the need to avoid sentencing disparities between Mr. Mebiame and others charged with FCPA violations in unrelated cases; and (8) Mr. Mebiame's otherwise good character and history of good deeds.

### 1.  Mr. Mebiame's Pre-Arrest Meetings With The Government

As detailed above, in 2015 – a year before both his arrest and the Och-Ziff resolution – Mr. Mebiame met *twice* with the Government to discuss the allegations at issue.  In those meetings, he voluntarily both incriminated himself and provided background information that was of value to the Government.  Although Mr. Mebiame did not ultimately pursue a full cooperation agreement, we respectfully submit that his extensive meetings with the Government – voluntarily, without counsel or any request for legal protection – militate in favor of leniency.

Even in the absence of a motion made by the Government pursuant to Section 5K of the Sentencing Guidelines, a defendant's pre-arrest meetings with the Government is a beneficial part of a defendant's history and character supporting a non-guideline sentence. *See United States v. Fernandez*, 443 F.3d 19, 33 (2nd Cir. 2006) ("We agree that in formulating a reasonable sentence a sentencing judge . . .  should take under advisement . . . the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to  U.S.S.G. § 5K1.1 . . . ."); *United States v. Lazenby*, 439 F.3d 928, 933-34 (8th Cir. 2006) (remanding for resentencing where the district court, among other things, failed to consider the defendant's cooperation with the Government in the absence of a Section 5K motion); *United States v. Ochoa-Ramos*, No. 07-CR-102, 2008 WL 2062341, at *3 (E.D. Wis. 2008) (considering defendant's cooperation with the Government as evidence of defendant's positive character and acceptance of responsibility under Section 3553(a) beyond [an acceptance of

responsibility] reduction under Section 3E1.1, in the absence of a Section 5K motion from the prosecution).

Here, Mr. Mebiame's two meetings with the Government – as detailed in the PSR and the Complaint – are reflective of an individual who tried to be open with the Government and in fact provided valuable incriminating information about himself as well as background information that was of value to the Government.  His candor and the information provided at these interviews deserves to be taken into account in fashioning a just sentence.

### 2.   The Circumstances of Mr. Mebiame's Arrest And His Time in Custody

We respectfully submit that the circumstances of Mr. Mebiame's arrest and his time in custody also counsel in favor of leniency.  As detailed above, Mr. Mebiame informed the Government that he was traveling to the United States with his niece and daughter, and of his desire to meet voluntarily – *for a third time* – with the Government.  Government agents confirmed their continued interest in meeting with Mr. Mebiame.  Unbeknownst to Mr. Mebiame, while the agents were communicating with Mr. Mebiame about his travel to New York, a Criminal Complaint had already been sworn and filed against Mr. Mebiame (which document was signed four days before Mr. Mebiame's travel to New York).   As discussed above, when Mr. Mebiame went to the prosecutor's office for what he expected to be his third meeting with the Government, he was immediately arrested.  This left Mr. Mebiame in the painful position of having been arrested and denied bail while he was entrusted with the care of these two young girls in Miami. This was a nightmare for Mr. Mebiame, and for his young niece and daughter, who were hastily told to pack their belongings, end their holiday without even seeing or speaking to Mr. Mebiame, and to travel as unaccompanied minors to Paris where they were collected by family members.

In fact, it is difficult to imagine a more painful problem that a parent could face – unable to care for young girls whom he had brought to a foreign country for holiday, and unable to even see or speak to them for comfort and guidance.  We respectfully submit that the circumstances of Mr. Mebiame's arrest, and the suffering this alone has already caused, should be taken into account in determining what, if any, further period of incarceration is necessary in this matter.

### 3.  Mr. Mebiame's Early Plea and Acceptance of Responsibility

As discussed above, Mr. Mebiame was arrested in August of 2016 on a criminal Complaint, and he entered a plea of guilty to a criminal Information in December 2016.   His early plea, acceptance of responsibility, and agreement to plead guilty to an Information (even before any Indictment or Rule 16 discovery) is reflective of Mr. Mebiame's mindset of early acceptance of responsibility.  We respectfully submit that it is quite rare for a defendant to submit to two voluntary interviews in which he makes incriminating statements, and to plead quickly to an Information without the need even for the Government to proceed before the grand jury.  We ask Your Honor to take this into consideration in meting out a fair and just sentence that takes into consideration Mr. Mebiame's early plea and acceptance of responsibility.

### 4.  Mr. Mebiame's Role In The Larger Investigation

We also submit that Mr. Mebiame's role in the larger investigation is a significant factor that counsels strongly in favor of a substantially reduced sentence. As noted in the PSR, this prosecution is part of a much larger investigation undertaken by the E.D.N.Y. and the Fraud Section of the Criminal Division in Washington D.C., which investigation has already resulted in the hedge fund Och-Ziff Capital Management (and related entities) resolving criminal charges

against it and agreeing to pay a <u>criminal penalty</u> of more than **$213 million**.[1]   Specifically, Och-Ziff entered into a deferred prosecution agreement in connection with a criminal Information which charged the entity with two counts of conspiracy to violate the FCPA, as well as a books-and-records violation and failure to implement adequate controls.  In addition, an affiliated entity, Och-Ziff Africa, also pleaded guilty (before Your Honor) to a one-count Information charging it with a conspiracy to violate the anti-bribery provisions of the FCPA.  Moreover, in related civil matters, the SEC obtained a cease-and-desist order against Och-Ziff Capital Management Group LLC, and OZ Management LP, and secured <u>disgorgement</u> of nearly **$200 million.**

This larger investigation, which is well documented in filings by the Government, demonstrates that Mr. Mebiame was *not* the mastermind or the prime beneficiary of this scheme, but rather that he was a small player in a "sprawling" scheme to engage in corrupt payments in a host of countries (including many jurisdictions which have no connection whatsoever to Mr. Mebiame) to gain **hundreds of millions of dollars** for a U.S. hedge fund and its investors. *See* Och-Ziff Plea Agreement, Statement of Facts, ¶ 58; Och-Ziff Information, ¶ 24.

We respectfully submit that the details of this larger investigation – which has identified the most culpable members who executed this elaborate scheme in half a dozen countries, obtained a benefit of over $200 million for their investors, and tens of millions of dollars for themselves – provides appropriate context for Mr. Mebiame's sentencing.  This context counsels strongly in favor of imposing a lenient sentence that reflects that fact that to-date Mr. Mebiame is the only

---

[1]     *See* https://www.justice.gov/opa/pr/och-ziff-capital-management-admits-role-africa-bribery-conspiracies-and-agrees-pay-213  (and links available at this website to the Deferred Prosecution Agreement and Statement of Facts, and related documents).

person who has been charged criminally, and, in the event that others are ultimately charged, that

Mr. Mebiame's sentence should reflect his much lower level of culpability.[2]

Specifically, public documents reveal that four executives of Och-Ziff have been sued

civilly by the Government (although to date no criminal charges have been brought against them)

for masterminding the scheme.  For example:

- Och-Ziff's *Founder* settled the SEC's civil claims for $2.2 million, but no charges have to-date been filed against him.   The SEC has alleged that he was Chief Executive Officer and Chairman of the Board of Och-Ziff, and had final decision-making authority over the transactions in Africa and Libya, and personally approved the DRC [Democratic Republic of Congo] and Libyan transactions, notwithstanding that he was aware of the high risk of corruption associated with these transactions. SEC Admin. Order ¶¶ 6, 45-47, 104.

- Och-Ziff's *CFO* settled civil claims for an unstated amount, but to date has not been charged with criminal violations.[3]  The SEC has alleged that as CFO of Och-Ziff he was responsible for maintaining accurate books and records, and controls, but approved transactions involving bribes, notwithstanding that he was aware of the high risk of corruption associated with these transactions.  SEC Admin. Order ¶ 6, 45-47.

- In January 2017, the SEC sued civilly two additional individuals who were the alleged "masterminds" and "driving forces" behind Och-Ziff's bribery scheme and alleged that the two executives "executed a sprawling scheme involving serial corrupt transactions and bribes paid to high-ranking government officials," in Libya, Chad, Niger, Guinea and the democratic Republic of Congo, and "spearheaded and participated in all of the corrupt transactions."[4] The SEC has alleged that the two "masterminds" "caused **tens of millions of dollars** in bribes to

---

[2]   *See United States v. Desmond*, 2008 WL 686779 (N.D. Ill. 2008) (loss adjustment of 20 levels vastly overstated the offense conduct and the defendant's culpability, *especially compared to the fact that the driving forces behind the corrupt activity were not prosecuted*).  As the Supreme Court emphasized in *Pepper v. United States*, 131 S. Ct. 1229 (2011), there shall be "'[n]o limitation . . . placed on the information concerning the background, character, and conduct' of a defendant that a district court may 'receive and consider for the purpose of imposing an appropriate sentence.'" *Id.* at 1241 (quoting 18 U.S.C. § 3661).

[3]   *See* https://www.sec.gov/litigation/admin/2016/34-78989.pdf ("SEC Admin. Order")

[4]   https://www.sec.gov/news/pressrelease/2017-34.html; *Securities and Exchange Commission v. Michael L. Cohen and Vanja Baros*, E.D.N.Y. Docket No. 17-430.

11

be paid to high-level government officials in Africa." To-date, no criminal charges have been brought against these two individuals.

In addition, the Government has identified a series of additional Och-Ziff employees and agents who allegedly created and implemented this vast scheme, each of whom has to-date not been charged. The Government has alleged the following:

- "Och-Ziff Employee 1" who is a U.S. citizen, was a high-ranking officer of Och-Ziff in its New York office who proceeded with the transactions in the Democratic Republic of the Congo ("DRC") despite recommendations not to do so. *See* Och-Ziff Plea Agreement Statement of Facts, ¶ 20. He also received emails from Och-Ziff Employee 3, discussed below, regarding the DRC and Libyan bribery plans. *Id*. and Och-Ziff Information ¶¶ 71, 73, 74.

- "Och-Ziff Employee 2," who is a U.S. citizen, was a high-ranking officer of Och-Ziff in its New York office, who while in New York approved the transfer of $160 mm, notwithstanding his understanding that the payments were in connection with a partner in the DRC who "paid bribes to officials." *See* Och-Ziff Plea Agreement Statement of Facts, ¶ 20.

- "Och-Ziff Employee 3," was a senior executive of Och-Ziff in its London office who met with officials in the DRC and understood that Och-Ziff's funds "would be used, in part, to pay substantial sums of money to DRC officials to secure access to" mining opportunities in the DRC, and "secured long-term deal flow" for Och-Ziff. *See* Och-Ziff Plea Agreement Statement of Facts, ¶ 16. He was made "aware of and participated in the corrupt payments" to secure mining interests in the DRC. *Id*. at ¶ 22. Together with Employee #5, he caused approximately $7.5 million to be delivered to a DRC Official in 2008, in additional to hundreds of millions in financing and other arrangements knowing that the underlying business plan included paying bribes to high-level DRC officials. *Id*. at ¶ 29, 36, 40.

- With respect to bribes in Libya, Employee #3 agreed to pay a $3.75 million finder's fee knowing that all or a portion of the fee would be paid to foreign officials in connection with a $300 million investment by Och-Ziff, resulting in a gain of $100 million. Information against Och-Ziff, ¶ 24, 66. He further paid a $400,000 deal fee to fund bribes for Libyan officials. *Id*. at ¶ 67.

- "Och-Ziff Employee 5," who is an Australian citizen, oversaw certain investments in Africa for Och-Ziff and met with officials in the DRC and understood that Och-Ziff's funds "would be used, in part, to pay substantial sums of money to DRC officials to secure access to" mining opportunities in the DRC and "secured long-term deal flow" for Och-Ziff. *See* Och-Ziff Plea Agreement Statement of Facts, ¶ 16. He was made "aware of and participated in the corrupt payments" to secure mining interests in the DRC. *Id*. at ¶ 22. Together with Employee #3, he caused approximately $7.5 million to be delivered to a DRC official in 2008, in additional to hundreds of millions in financing and other arrangements knowing that the

12

underlying business plan included paying bribes to high-level DRC officials. *Id*. at ¶ 29, 36, 40. In fact, he was told that "$50 million was for a DRC Partner to 'use on the ground' to corruptly acquire an asset, and understood that in 2010-2011 an additional $20 million in corrupt payments was made to DRC Officials. *Id*. at ¶ 47, 54.

We respectfully submit that in imposing sentence the Court should take into consideration that fact that – to-date – Mr. Mebiame is the only person who has been charged criminally in connection with the allegedly sweeping Och-Ziff scheme to influence business corruptly in multiple African countries – the vast majority of which allegations have no connection to Mr. Mebiame at all. Moreover, the reason that Mr. Mebiame alone has been prosecuted to date has nothing to do with any alleged higher level of involvement or culpability, but rather, is a direct result of his unsophisticated (and some might say foolish) decisions to meet voluntarily with the Government, to provide information that could be used against him, and then to announce his anticipated return to the U.S. (with a request to meet with the Government again). Under these unique circumstances, we respectfully submit that Mr. Mebiame's sentence should reflect his significantly lower level of culpability as compared with others whom have not been charged to date, and whom may or may not ever be charged.

### 5. The Advisory Guidelines Overstate the Seriousness of Mr. Mebiame's Conduct

As noted in the PSR, application of the sentencing guidelines results in an adjusted offense level of 33, based in large measure on the value of the payments made in Niger, Chad and Guinea. *See* PSR ¶ 18. This results in an advisory sentence of 135 to 168 months. However, as noted in the PSR, the maximum sentence is five years pursuant to 18 U.S.C. § 371. *See* PSR ¶ 57. We respectfully submit that the Guidelines calculation, and even the five year maximum sentence, greatly overstates Mr. Mebiame's culpability.

13

Specifically, the PSR's guidelines calculation here is increased to a devastating effect by its application of an <u>18</u> level increase under U.S.S.G. § 2C1.1(b)(2) to reflect that between $3.5 mm and $9.5mm in bribes were allegedly paid. This 18 level increase is based on a cross-reference to the fraud loss table. The use of the fraud loss table, set forth in 2B1.1, however, is an ill-suited proxy for culpability in this case. Indeed, that table was designed to apply in most instances when a defendant has *caused* the dollar value of loss, by, for example, defrauding investors out of their hard-earned money. In cases such as the one at hand, however, the loss table is not reflective of graduated culpability.

As the Second Circuit recently noted:

> Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence. . . . We do not rule that the sentences were imposed in error. We conclude only that a remand is appropriate to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence**.**

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016).

This is consistent with Second Circuit Judge Jon O. Newman's testimony before the Sentencing Commission, where he criticized the complexity of the Guidelines, particularly the underlying premise that "every increment of offense conduct, no matter how slight, must result in a corresponding increment of punishment." In criticizing the complexity of the loss table used in fraud and theft cases, Judge Newman stated that "it makes no penological sense to insist that nearly every extra dollar of loss should result in some extra punishment."[5] *See also, United States v.*

---

[5]     U.S. Sentencing Commission Public Hearing Testimony and Transcripts (July 9, 2009) (statement of Judge Jon O. Newman, U.S. Court of Appeals for the Second Circuit), available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20090709 -10/Newman_testimony.pdf.

*Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) (noting that securities fraud calculations that are based on 2B1.1, "have run so amok that they are patently absurd on their face"); *United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008) (observing that these matters result in "piling-on of points"); *see also United States v. Mueffelman*, 400 F.Supp.2d 368, 377-8 (D. Mass. 2005) (in imposing below-Guidelines sentence that "issues concerning the blameworthiness of a defendant found guilty of fraud are more complex than simply measuring the amount of loss"); *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (the Guideline "loss" table can be a highly inaccurate measure of culpability); *United States v. Morris*, 837 F. Supp. 726, 729 (E.D. Va. 1993) ("[m]echanical application of the Federal Sentencing Guidelines may yield 'an illusory mathematical precision that, when slavishly followed, is antithetical to effective and conscientious sentencing.'").[6]

Here, we respectfully submit that the offense level of 18 under 2C1.1(b)(3) – without any enhancement under sections 2C1.1(b)(2) and 2B1.1 – is a far more appropriate base offense level from which to judge Mr. Mebiame's level of criminal culpability.  That offense level – which is quite high – reflects the fact that the underlying offense involved a conspiracy to make more than one corrupt payment, and involved high-level officials – but does not reflect the dollar value of the payments made to foreign officials, as the value of these payments does not reflect on Mr. Mebiame's culpability. *See* U.S.S.G. § 2C1.1(b)(1) and (3).   We submit that the offense level of 18 would then be reduced by 3-levels (as suggested by the Probation Department) under 3E1.1 to reflect Mr. Mebiame's early plea and acceptance of responsibility.  This results in an adjusted

---

[6]    The disconnect between the Guidelines and a defendant's relative culpability in bribery cases is reflected in the *actual sentences* courts imposed to reflect the *true culpability* of the defendants.  Specifically, the Sentencing Commission reports that of the 216 sentences imposed for bribery offenses in 2015, over 30% were sentences below the advisory guidelines range *even without support by the Government;* and another approximately 30% were below the guidelines range with Government sponsorship.  U.S. Sentencing Commission's 2015 Sourcebook of Federal Sentencing Statistics, at Tables 27 and 28.   Thus, at least 60% of defendants' sentences for bribery offenses received sentences *under* the advisory guidelines.

offense level of 15 – with a corresponding advisory sentence of 18-24 months – as the starting point for an advisory guidelines range.  With that range as an advisory reference point, we respectfully submit that the Court should impose a non-guidelines sentence of time served.

### 6. Mr. Mebiame Has Already Been Incarcerated for Almost 9 Months, and As a Foreign National, Will Serve a Longer and More Severe Sentence than Would a Citizen

We further ask Your Honor to consider the conditions and length of any sentence of imprisonment that Mr. Mebiame has already served and will serve given his lack of U.S. citizenship or resident alien status.

*First,* we ask that your Honor consider the fact that Mr. Mebiame has been detained at MDC – an institution housing individuals of all security classifications – since his arrest in August 2016.  This pre-trial detention has been particularly harsh on Mr. Mebiame, who has been charged in a white-collar, non-violent offense, and has no criminal history.  Indeed, his detention – thousands of miles away from his friends and family who have been unable to visit him – has been brutal for Mr. Mebiame, and stands in stark contrast to the treatment a U.S. citizen would have received upon his or her arrest on similar charges.  Indeed, given the non-violent nature of the offense and a statutory maximum of five years, had Mr. Mebiame been a U.S. citizen or resident alien he would almost surely have been released on bail with modest reporting requirements.  As a foreign national, however, he has already faced severe punishment.  We submit that Mr. Mebiame's detention at MDC under these circumstances warrants consideration in favor of a substantially reduced sentence.

*Second*, not only has Mr. Mebiame already been subject to disparate treatment due to the fact that he is a foreign national,  but such treatment will continue and will subject Mr. Mebiame to a harsher and longer term of imprisonment than would be faced by a similarly situated U.S.

16

citizen or resident alien.  For example, if sentenced to additional imprisonment, Mr. Mebiame will serve a longer sentence than an American citizen because he is not eligible to serve the last months of his sentence at a half-way house, as would an American citizen.  A BOP guidance memo issued on June 2010, says that prisoners should be considered for **at least** three months and up to **six months** in a halfway house, but also states that this option is **not** available for a deportable alien, such as Mr. Mebiame.[7]  We ask that Your Honor consider this factor as well in determining an appropriate sentence for Mr. Mebiame.

*Third*, if sentenced to additional imprisonment, Mr. Mebiame will serve his sentence at a higher security level facility as a foreign national subject to deportation.   Under BOP policies a non-United States citizen "shall be housed in at least a low security level institution." See *BOP Program Statement* 5100.08, Chapter 5, p. 9.  A "low security level institution" is one security level above a "minimum security facility," *i.e.*, a camp. *See*, Federal Bureau of Prisons Website, "About Our Facilities." As a result of this policy, if Mr. Mebiame were sentenced to additional incarceration, unlike other similarly-situated defendants who are U.S. nationals, he would serve his time in a higher security-level facility and, as discussed above, would serve a longer sentence.

We ask that Your Honor take these factors into consideration in determining an appropriate sentence for Mr. Mebiame, and believe that they argue in favor of leniency.

### 7.  The Need to Avoid Unwarranted Disparities Among Similarly Situated Defendants

In addition, just as Mr. Mebiame should not receive a sentence that overstates the seriousness of his conduct as between others involved in the same or related schemes, he should

---

[7]      Federal Bureau of Prison, "*Revised Guidance for Residential ReEntry Center (RRC) Placements*", June 24, 2010 (noting eligibility for "up to 12 months pre-release RRC placement" for prisoners), *but see for example,* 28 C.F.R. § 550.55 "Eligibility for early release" (inmates are not eligible for early release if they are subject to deportation).

not receive a sentence that is disproportionate to others sentenced in unrelated FCPA cases. Indeed, Section 3553 provides that the sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Second Circuit has acknowledged this requirement on multiple occasions. *See United States v. Brennan*, 395 F.3d 59, 69 (2nd Cir. 2005); *United States v. Dorvee*, 616 F.3d 174, 182-3 (2nd Cir. 2010); *United States v. Cavera*, 550 F.3d 180, 188-9 (2nd Cir. 2008).

Avoidance of unwarranted sentencing disparity is frequently cited as at least a partial justification for a downward departure or other below-Guidelines sentence. U.S. Sentencing Commission's 2015 Sourcebook of Federal Sentencing Statistics, at Tables 25A and 25B (avoidance of unwarranted sentencing disparity cited as reason for a below-Guidelines sentence or downward departure 3,212 times in 2015). Defendants in fraud cases received a below-Guidelines sentence or a downward departure in about 60% of cases in 2015. *Id.* at Table 27. Of those defendants sentenced under § 2B1.1 in 2015, 4,374 individuals received a below-Guidelines sentence, the vast majority of which sentences were *not* supported by the Government. *Id.* at Table 28.

According to the U.S.S.G. Sourcebook for 2015, as to federal defendants sentenced for "bribery," the median sentence was 18 months. USSG Sourcebook, Table 13. Moreover, the disparity between the advisory sentences under the Guidelines, and the sentences imposed in FCPA cases, is even more dramatic. For example, in an article published in *Business Crimes Bulletin*, the author observed that there is a "growing rift between the views of the DOJ and the courts as to the appropriate sentences for individual violators in FCPA cases," and the fact is that recent sentencing decisions have not supported prosecutors' efforts to obtain lengthy prison

sentences for FCPA violators.  *See* Stein, Sentencing of Individuals in FCPA Cases, Business Crimes Bulletin, Vol. 18, No. 5, Jan. 2011.  According to this article, in FCPA cases "a Guidelines sentence is the exception rather than the norm," and post-Booker, 81% of defendants who have been sentenced for FCPA violations have received below-guidelines sentences. *Id.*

In this case, we respectfully submit that a sentence of time served, which is roughly equivalent to a sentence of a year and a day, would be in parity with other sentences imposed against individuals for FCPA violation, including the following:

- *United States v. Garth Peterson*, E.D.N.Y. 12-224 (Weinstein, J.): defendant sentenced to **9 months' imprisonment** where he personally earned a $2.5 million profit from a multi-year illegal scheme in China (and his coconspirators earned nearly $7 million), notwithstanding that he was trained 7 times in the FCPA, and was reminded by his employer to comply with the FCPA at least 35 times, and ***notwithstanding that the Government sought a sentence of at least 51 months' imprisonment***.

- *United States v. Frederic Bourke*, S.D.N.Y. 05-518: defendant sentenced to **1 year and 1 day**, with a recommendation of a minimum security camp facility, in an FCPA case following a jury trial involving what the Government described as "one of the most audacious and most corrupt investment schemes ever attempted in the former Soviet Union," given the "enormous bribes" of over $11 million to "take over the most significant asset of an entire nation and keep for themselves the enormous profits they expected that asset to generate;" the advisory guidelines were 120 months, and ***notwithstanding that the Government requested a sentence of 120 months.***

- *United States v. Richard Hirsch*, D. N.J. 15-358: defendant sentenced to **2 years' probation** where he conspired and did make corrupt payments in India and Vietnam, and the company entered into a deferred prosecution agreement and agreed to pay a $17.1 million penalty based on a 10-year long conspiracy.

- *United States v. James McClung*, D. NJ 15-357:  defendant, a U.S. citizen, sentenced to **1 year and 1 day** with a recommendation that the time be served at a camp facility and the latter portion of his sentence be served in a halfway house in New York, where the defendant conspired and did make corrupt payments in India and Vietnam, and the company entered into a deferred prosecution and agreed to pay a $17.1 million penalty based on a 10-year long conspiracy.

- *United States v. Nguyen*, E.D. Pa. 08-522: lead defendant sentenced to **16 months' imprisonment** where for nearly a decade he made dozens of bribes to promote business in Vietnam, ***notwithstanding that the Government sought a sentence of 168-210 months imprisonment***.

- *United States v. Nguyen*, E.D. Pa. 08-522: siblings of lead defendant sentenced to **9 months** imprisonment *notwithstanding that the Government sought a sentence of 87-108 months*, in connection with the above-mentioned scheme in Vietnam.

- *United States v. Jim Bob Brown*, S.D. Tex. 06-316: defendant sentenced to **1 year and 1 day** in an FCPA case involving payment of $6 million of bribes in Nigeria for an asset valued at approximately $387 million, in addition to other corrupt payments including those made in Ecuador.

- *United States v. Jason Edward Steph*, S.D. Tex. 07-307:  defendant sentenced to **15 months,** with a recommendation of a low-level facility, in an FCPA case involving payment of $6 million of bribes in Nigeria for an asset valued at approximately $387 million, in addition to other corrupt payments.

- *United States v. Gerald and Patricia Green*, C.D. Cal. 08-59: defendants, a husband and wife, sentenced to **6 months,** following a conviction at trial for FCPA violations in connection with their personally obtaining over $13 million of business in Thailand, where the guidelines range applicable to them was 360 months and 235-293 months respectively, and *notwithstanding that the Government sought a "significant number of years in prison."*

- *United States v. Bernd Kowalewski,* N.D. Okl.  12-007:  defendant sentenced to **time served**, notwithstanding an advisory range of 108-135 months imprisonment, relating to a series of bribes paid in Mexico to obtain contracts.

- *United States v. Peter Dubois*, N.D. Okl. 11-183:  defendant sentenced to **8 months' home detention, and 5 years' probation,** in FCPA case relating to a series of bribes paid in Mexico to obtain contracts, *notwithstanding that the Government sought a downward departure of only 15 levels for cooperation (which brought the defendant from an advisory range of 108-120 months to 21-27 months)*.

- *United States v. Neal Uhl*, N.D. Okl. 11-184:  defendant sentenced to **8 months' home detention, and 5 years' probation** (which was terminated after only 3 years), in case relating to a series of bribes paid in Mexico to obtain contracts, *notwithstanding that the Government sought a downward departure of 15 levels for cooperation (which brought the defendant from an advisory range of 108-120 months to 21-27 months).*

As these prior sentences and the empirical data demonstrate, sentences imposed in the FCPA arena are consistently well below what the advisory guidelines recommend or the sentences sought by the Government.  We respectfully submit that the same should be true here, and that a sentence of time served (the approximate equivalent of a year and a day) is fair and appropriate. Indeed, we respectfully submit that a longer sentence would be inconsistent with Section 3553(a), which directs courts to avoid unwarranted sentencing disparities.

### 8.  Mr. Mebiame's Character and History

Over the last eight months, political instability has rocked Gabon due to a recent election and broad allegations of electoral fraud.  Moreover, the current forces in power are opposed to those who were loyal to Mr. Mebiame's father, and with whom Mr. Mebiame has worked in the past. These conditions have made it difficult to communicate with those of Mr. Mebiame's friends and family members who remain in Gabon.  These conditions have also made it impossible for Mr. Mebiame to access any funds, including funds to pay his ongoing legal fees or even commissary expenses (which expenses we have advanced on his behalf).

Nonetheless, numerous friends and family members have sent letters of support of Mr. Mebiame.   These letters reflect Mr. Mebiame's good and generous character, his history of aiding those in need, and the impact his arrest and custody have had on his family – particularly his teenage daughter Shekina. Section 3553(a)(1) instructs courts to consider the "history and characteristics of the defendant" when determining an appropriate sentence.  We ask Your Honor to consider these factors as well.

### a.  The Impact of Mr. Mebiame's Arrest on His Daughter

Mr. Mebiame has a very close relationship with his daughter.  He has always cared for her and was expected to be her primary caregiver and custodial parent during her teen years.   The longer he is imprisoned in the United States, the more he will miss her development, and more importantly, the more Shekina will miss her father.  As Your Honor is well aware, children of incarcerated parents suffer emotional and psychological effects during the period of incarceration. *See* Children of Incarcerated Parents Project, Report to the Oregon Legislature on Senate Bill 133, at 1 (2002). Indeed, children who are able to visit their parents in prison during the time of imprisonment fare better than those who cannot. *See* Kathleen Z. Russell, et al., Children of

Incarcerated Parents 11 (2006). Unfortunately, that option is not realistically available to Mr.

Mebiame's daughter, who is in Gabon while her father is imprisoned in the United States.

> Shekina – at the age of 13 – wrote beautifully and honestly about her father:
>
> My name is Shekina Mebiame and I am Samuel Mebiame's daughter.  Sam is my father and I can only say good things about him.  I recall my Father telling me always to be good to people and never to expect anything in return.  You do as much good as you can and that's all you can do.  Nobody knows my Father better than I.  I know my Dad has a big heart and he loves to help people.  He has always been there for me.  I know he's been working hard to take care of me.  I don't know all the details about my Father's work, but all I know is that he works hard and tr[ies] his best to be good to people around him.
>
> I know my Dad is fair and has the ability to recognize where he went wrong.  I know that this time away from us all is a time of serious reflection.  I know that he misses us as much as we miss him.
>
> I remember Dad telling me that life is a test.  Trials and tribulations are there to make us better.  We got separated in a very unexpected way.  I remember the last conversation we had like it was yesterday.  Your Honor, My Dad is a great man and I am sure he made some mistakes like everybody else.  I know that all he wishes is to be a good citizen. Whatever you choose to do when it comes down to his sentencing your Honor, just remember from a Father standpoint the fact that I, his daughter, need him in my life. . . .

Exh. A.

### b.  Mr. Mebiame's History of Good Deeds, Including Working To Release French Foreign Nationals Held in Niger in 2008

For years, Mr. Mebiame has aided Gabon and other African countries in a number of

critical matters. We submit that these activities are more emblematic of Mr. Mebiame's essential

character than the offense conduct.  Of note, in 2008 a rebel group in Niger took captive four

French hostages, and held them for three days.  As Mr. Desire Ename, the Editor and Chief of

Echos du Norde, a Gabonese newspaper, described:

> Samuel was the key person who helped to free those hostages.

Afterward, I heard that the president of Gabon wanted to stipend him. But Samuel Mebiame refused to take money for what he had done, arguing that he did it for his country as that question was a great challenge for the authorities of Gabon.

I was so impressed by this sense of abnegation and integrity, and most of all by his patriotism. It is seven years later that I really came to know Samuel Mebiame. A common friend . . . introduced us. It was in November 2013. From that time to now [], I quickly became a close friend of Samuel Mebiame. A friend who he can really count on, and reversely. And those recent years, living in exile since 2014, he has showed me real concern about that awful situation. When I was morally broken he has been there to comfort me.

I know how the harshness of life can change people. How it can corrupt a person. And I also know how special circumstances can lead anyone to make bad choices. And I know that anyone of us can [make a] mistake at that precise moment. But I know that the values enshrined in us who are honesty, integrity, altruism, do not disappear. And I am convinced that whatever Samuel Mebiame has done, he could never depart from those values. For me, this loving father, remains an honest person who always has my support.

Exh. B.

We submit that Mr. Mebiame's willingness to help in these types of matters (with no remuneration to him) is emblematic of his true character. Mr. Mebiame's kind, generous and giving spirit, which drove him to help in the hostage situation, are the same characteristics that caused him to help disadvantaged, poor, hungry, or orphaned individuals as described in the letters below. Under section 3553, we ask that Your Honor take into consideration Mr. Mebiame's character in imposing a just sentence here.

### c.  Mr. Mebiame's History, Character and Charitable Acts

The letters we have appended to this submission speak consistently of how Mr. Mebiame overcame the personal hardships of growing up while his parents were preoccupied with matters of national and international importance to Gabon, and how he earned the respect and admiration of his friends and family members who have witnessed and benefitted from Mr. Mebiame's generous and kind character.

23

Mr. Mebiame's 70-year old mother, Alice Mbie Mengome, the former wife of Prime Minister Mebiame, candidly acknowledges that while Mr. Mebiame enjoyed certain privileges growing up the son of the Prime Minister, the demands on her and Prime Minister Mebiame did "not allow us to provide our children with all the attention they should have received from their parents," and they were instead raised by their extended family.   Exh. C.   Ms. Mengome reflects on the strength Mr. Mebiame has shown when thrust in the role of patriarch both following his parent's divorce and then the death of his father.   She writes:

> As his mother, I must admit that I am very proud of the man and the father he has become. We, parents, we also grow as we raise our children, and as we grow we realise our shortfalls in the education we have provided them with.  For that I am thankful to the Almighty to have allowed my son [to] be a person with a solid character with strong values, and who is also willing to do the utmost to raise his own children and do good around him.. . . Samuel has one brother and two sisters from me and his father.  However his father has a total of 23 children.  Samuel is not the oldest.  That said, when his father who was a wealthy man passed away in December 2015, came the highly sensitive subject of the inheritance.  In Gabon, many social subjects are governed by both the official and traditional laws.  The inheritance of one man amongst his 23 children from different mothers with various marital statuses is a very very difficult matter to solve.  Amongst the people in his father['s] family that have a right in this inheritance and a say in how it is split, you can imagine that everybody does not agree with everybody. Despite these divisions that are to be expected in a family of that scale, Samuel was mandated by the family Council as the sole administrator to deal with the Gabonese courts, in order to reach a fair and prompt settlement for all entitled parties.  . . . Samuel was due to visit Gabon to settle this matter, but he was detained in the USA.

Exh. C.

Nathalie Karine Mebiame, Mr. Mebiame's sister, a single mother who has depended on Mr. Mebiame for his emotional and his financial support, describes how she has always been "very close, despite the ups and downs of being siblings."  She describes Mr. Mebiame as "responsible, protective, caring, loving, [and] supportive."  Exh. D.  She writes:

> There will be so much to say to describe my brother, a good son, a good father, a must have friend…a human being, trying to improve himself everyday, knowing he will never be perfect but doing his best. As we all do.

Since our father['s] death in December 2015, my brother tried to avoid our family to split, fighting to keep united 23 children born[] from different mothers.  Samuel have always been very supportive for all the people he knows.  People still ask[] how he is doing and send him prayers. . .

Mr. Mebiame's 18 year-old nephew, Noah Gockot N'Kaya, describes his close relationship

with Mr. Mebiame:

My uncle Samuel is a father for me.  I would say even [he] is my father.  He always took care of me as his son…

My father Sam always [w]as a model for our family.  Like my mom, his sister, he wants [me to] work very hard at school, he wants [me to] win my life, he always wants [me to] become a better man.

…He calls us the little soldiers, because he said we must give the best of ourselves, no matter what, no matter when, no matter where, no matter how.  He's a very good dad.  He always wants the best [for] his children and we're doing everything so that he is proud of us.

Exh. E.

Mr. Mebiame's 23 year-old nephew, Matt Anthony Junior Yalanzele Mebiame, who is

applying to graduate programs in finance in the United States, describes the enduring love and

support Mr. Mebiame has provided generously to his extended family:

I have so many Uncles, My Family is really big but today I am writing to you to speak about Samuel, the Best person I have ever met in My Life.

The first thing which occurs me when I hear My Uncle's Name is Love.  Not Only the Paternal Love because is my Family. The True Love because that is the thing my uncle is always showing to us, his Family and his Friends.

. . . He's more than a uncle to me, he's my Father. He raised us with a strong mentality, Never give up no matter what.  . . .

When I meet People, they are ALWAYS Happy to tell me how much they know him, how much is a nice Person.  ONCE I went to a Friend's  House and when I told my name, His parents Started to call me " Son " because they knew my Uncle.

Exh. F.

25

Mr. Mebiame's close friend Chantal Myboto, a municipal counselor and businesswoman, has known Mr. Mebiame for virtually her entire life, as their fathers served in the highest levels of the Gabonese government together.  She says:

> Samuel has always been a very respectful, kind, and generous individual.  He is a loyal friend and a very lovely father for his daughter Shekina and a very caring son for his mother Alice.  For both of them Samuel is the principal support.
>
> Samuel is a good patriot whose particular collaboration to the Gabonese government was well appreciated between 2007 and 2009.

Exh. G.

Mr. Mebiame's generous and kind character was not only evident to his family members as described above, but it is also evident to his friends and colleagues as well, each of whom witnessed Mr. Mebiame's humble altruism and kindness.

Marc Ona Essangui, the founder of the non-governmental organization Brainforest and the president of Environment Gabon, a network of NGOs, has worked tirelessly to protect the equatorial rainforest ecosystem in Gabon.  He has been an outspoken critic of the current president of Gabon, and has sought a voice for Gabonese citizens.  Mr. Essangui wrote:

> It is with great emotion that I speak of Samuel Mebiame. This young Gabonese, intelligent, ambitious for his country who decided when he was very young to fly on his own wings and to leave the family and enter the business world. He has been a model of success for the young Gabonese generation. I met him for the first time in my office in Libreville as part of a consultation that I wanted in connection with the mining activity in Africa and I discovered a fine connoisseur of environment.
>
> He decided to become our consultant in the matter without asking to be paid. This is a strong act for an expert in the service of a non-resourced NGO.

Exh. H.

Similarly, Marcel Libama, administrative delegate of the National Convention of Trade Unions in the Education Sector, described Mr. Mebiame as having values of "solidarity, love and neighbor, and sense of honor."   Exh. I.    Mr. Libama recognized that notwithstanding Mr.

Mebiame's upbringing as the son of the Prime Minister, Mr. Mebiame "is still close to his neighbor, ready to come to help and rescue those in need around him."     He notes that Mr. Mebiame's "advice and other financial and material contributions have made it possible for teachers and their families to survive the suspension of salary that many trade union teachers have been subjected to for years."  Even at his father's funeral, Mr. Mebiame provided counsel and support for Mr. Libama's union work.  It is this kindness and thoughtfulness that is most descriptive of Mr. Mebiame's character.

Mr. Mebiame's friend Kouyate Badara describes him as a person who has "his heart in his hands" "a good father" and a person on whom "a friend .. can count."  He describes Mr. Mebiame's altruistic endeavors to help the citizens of Gabon to live better lives, including individuals with handicaps, and orphans.  As Mr. Badara says:

> Mister SAMUEL allowed a lot of people to get out of the street and find a roof;  I saw this gentleman come to help people he never knew in his life, intervene to help people to heal other people with serious illness having no means and condemned to die, and thanks to the intervention of Mister Samuel Mebiame they had their lives saved.

Exh. J.

Eric Moutet, a seasoned human rights and labor lawyer in Paris who has advocated on behalf of many interests in Gabon, also described Mr. Mebiame's "good spirit" and that he is a "trusted person" in an otherwise politically turbulent environment.  As the other character letters evidence, Mr. Moutet also experienced Mr. Mebiame's unpretentious manner of "always [being] available and ready to render service," with "great generosity."   Mr. Moutet recalls that when he was visiting Africa and learned of his own brother's death, Mr. Mebiame's "compassion and his very strong presence enabled me to live this very difficult moment a little more serenely."  As Mr. Moutet said:

> I am absolutely convinced of Samuel's great ability to rehabilitate himself, his great soul always pushing him naturally towards others. I hope that the punishment that will be inflicted on him will be as short as possible, he is a boy who loves life, many people need him and expect his release with great hope…

Exh. K.

These letters stand as a testament to how Mr. Mebiame has lived for 43 years – as a generous, thoughtful and kind person who has cared for his friends, family, disadvantaged people and anyone in need without regard to his status in Gabon as the son of one of the fathers of the country. This life of caring and good works should be deeply taken into account in fashioning a just sentence for Mr. Mebiame. As is often said, in sentencing an individual the Court must take into account the full picture of that individual's life – both the good deeds and the bad. Here, we respectfully submit that Mr. Mebiame's good deeds far outweigh the conduct for which he is facing sentence. Accordingly, we ask the Court for leniency.

## IV.    Additional Sentencing Recommendation

For the reasons set forth above, we respectfully request that Your Honor impose a sentence of time served. However, in the event that Your Honor imposes a sentence of 24 months or greater, we ask that Your Honor recommend that Mr. Mebiame be permitted to serve his sentence in France, where he is a citizen and has significant personal ties.

The United States and France participate in a program which permits citizens of their respective countries to serve their sentence (for a limited number of criminal offenses) in his/her own country. The program is based on the "universal understanding that a prisoner has the best chance of being successfully rehabilitated and reintergrated into a society where a support system exists to assist the prisoner's adjustment to life after incarceration."[8]  For transfer to France, we

---

[8]      https://www.justice.gov/criminal-oeo/guidelines-evaluation-transfer-requests-submitted-foreign-nationals

understand that a prisoner must have a minimum of one year remaining on his sentence to be eligible for the program.

In this instance, the International Prisoner Transfer Unit at the Department of Justice would evaluate Mr. Mebiame's application to serve his sentences in France, and his transfer could occur only upon the consent of both the United States and France.   *As set forth in the Plea Agreement entered in this case, the Government has agreed not to oppose such an application.   See* Plea Agreement, ¶ 8.

Accordingly, if an extended sentence is imposed in this case, we respectfully request that Your Honor recommend that Mr. Mebiame be permitted to transfer his sentence to his home country of France, where he has a significant support system of friends and family, and where his support network in Gabon can visit him and help him after he has served his sentence.   We appreciate that the ultimate decision rests with International Prisoner Transfer Unit and the corresponding French authorities, but we expect that a recommendation from Your Honor would be well received by these agencies.


Dated: New York, New York
         April 20, 2017

<div style="margin-left:40%">

Respectfully submitted,

/s/
_____
Larry H. Krantz, Esq.
Wendy Gerstmann Powell., Esq.
**Krantz and Berman LLP**
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009
*Attorneys for Defendant Samuel Mebiame*

</div>

29