JPL
F. #2012R01716

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -                Cr. No. <u>16-627 (NGG)</u>

SAMUEL MEBIAME,

        Defendant.

– – – – – – – – – – – – – – – – – – – X

<u>SENTENCING MEMORANDUM</u>

| | |
|---|---|
| ANDREW WEISSMANN | BRIDGET M. ROHDE |
| Chief, Fraud Section | Acting United States Attorney |
| U.S. Department of Justice | Eastern District of New York |
| 1400 New York Avenue, NW | 271 Cadman Plaza East |
| Washington, D.C. 20005 | Brooklyn, New York 11201 |
| | |
| Leo Tsao | James P. Loonam |
| Assistant Chief, FCPA Unit | David Pitluck |
| James McDonald | Jonathan Lax |
| Trial Attorney, FCPA Unit | Assistant U.S. Attorneys |
| |     (Of Counsel) |

TABLE OF CONTENTS

Preliminary Statement ........................................................................................ 1

I.        Offense Conduct ................................................................ 2

    A.    Uranium Concessions in Niger ....................................... 3

    B.    Mining Rights in Guinea ................................................ 3

    C.    Expropriation of Mining Asset in Chad ......................... 4

    D.    Mebiame's Personal Compensation for his Corrupt Conduct .................... 5

    E.    Mebiame's Interactions with Law Enforcement ........................................... 6

II.      Applicable Law .............................................................. 8

III.    The Application of the Guidelines .................................. 9

    A.    The Guidelines Calculation ............................................ 9

    B.    The Applicable Guidelines Do Not Overstate the Seriousness of the Defendant's Offense ................................................. 9

IV.    Sentencing Factors under 18 U.S.C. § 3553(a) ........................................... 13

    A.    The Nature and Circumstances of the Offense Warrant a Guidelines Sentence ................................................. 13

    B.    The History and Characteristics of this Defendant Warrant a Guidelines Sentence ................................................. 14

    C.    The Need for General and Specific Deterrence Warrants a Guidelines Sentence ................................................. 15

    D.    The Need to Promote Respect for the Law Warrants a Guidelines Sentence ................................................. 16

    E.    The Need to Provide Just Punishment Warrants a Guidelines Sentence ... 18

    F.    A Guidelines Sentence would not Result in an Unwarranted Sentencing Disparity ................................................. 19

Conclusion ........................................................................................ 23

<u>PRELIMINARY STATEMENT</u>

Prior to his arrest, the defendant Samuel Mebiame led a life of extraordinary privilege.  As the first son of the former Prime Minister of Gabon, Mebiame had opportunities many can only dream of.  Mebiame attended boarding school in France, became fluent in three languages and had personal contacts with high-level officials in governments across Africa, including the Presidents of many countries.  Despite these opportunities, Mebiame chose to become a "fixer" and built a business that profited through corruption to support his jet-setting lifestyle between South Africa, Paris, Gabon and Miami.  The conduct at issue does not reflect a momentary lapse in judgment, or a one-off business transaction; rather, the conduct at issue represents Mebiame's choice to make corruption a way of life.  This way of life was lucrative for Mebiame; he personally profited more than $7 million from his illegal conduct.

Far from a victimless crime, corrupt conduct, like that engaged in by Mebiame, inflicts harm on numerous individuals and entities, including: individual citizens who are deprived of the honest services of their public officials and competing business entities that play by the rules.  Corrupt conduct, like that which Mebiame engaged in, corrodes rather than promotes respect for the law and undermines government institutions.  All of this leads to greater instability in the countries Mebiame operated in, much to the detriment of the citizens of those countries and to the world.

As a result of the statutory maximum sentence, the United State Sentencing Commission Guidelines ("Guidelines") call for a sentence of 60 months' imprisonment in this case.  By written submission dated April 20, 2017 ("Def. Sent. Mem."), Mebiame argued for a sentence of time served, which would represent a sentence 85 percent below the

1

applicable Guidelines range.  The government respectfully submits that the serious nature and circumstances of Mebiame's crime, the need for general and specific deterrence, the need to promote respect for the law and the need to provide just punishment weigh heavily in favor of a Guidelines sentence.

I.    Offense Conduct

The defendant Samuel Mebiame is a Gabonese national who worked as a consultant for a joint venture (the "Joint Venture") between a U.S.-based hedge fund, Och-Ziff Capital Management LLC ("Och-Ziff") and a Turks & Caicos Islands incorporated entity (the "Turks & Caicos Entity") between approximately 2007 and 2015.  Mebiame's job was to secure mining rights for the Joint Venture and one of its portfolio companies (the "Mining Company").  (Presentence Investigation Report ("PSR") ¶ 4.)

Mebiame worked as a "fixer" to obtain rights to mineral concessions in Africa by routinely paying bribes to foreign government officials.  (PSR ¶ 5.)  Mebiame bribed government officials in at least each of Niger, Guinea and Chad.[1]  (PSR ¶¶ 5, 8.)  Mebiame began acquiring assets for the benefit of the Joint Venture in 2007 and began formally consulting for the Joint Venture upon its formation in 2008.  (PSR ¶ 5.)  These assets were worth hundreds of millions of dollars.  (See e.g., Letter from a Mining Company, dated June 11, 2009, at p.1 ("June 11, 2009 Letter," attached as Exhibit A)).[2]

---

[1] Mebiame personally took numerous steps while in the United States in furtherance of his corrupt scheme, including, but not limited to, sending and receiving email and other communications with coconspirators about the corrupt scheme, receiving payments related to the corrupt scheme into U.S. bank accounts he established and meeting with coconspirators to discuss the corrupt scheme.

[2] The government has redacted Exhibit A because it contains the names of uncharged individuals and entities and sensitive personal identification information of the defendant.

2

Corruption was at the core of Mebiame's business.  When Mebiame was asked by a coconspirator to attend anti-corruption training and sign anti-corruption representations for corporate compliances purposes, Mebiame commented that it would "kill" his business if he could not pay government officials.  (Complaint, 16-M-752 at ¶ 12.)

A.    Uranium Concessions in Niger

Niger is a country in Africa.  According to the World Bank, Niger "is prone to political instability [and] chronic food security. . . . With a poverty rate of 48.9% and a per capita income of $420, Niger is one of the world's poorest nations.  In 2015, it ranked 188th of 188 countries on the United Nations Human Development Index."  See The World Bank Niger Country Report, available at http://www.worldbank.org/en/country/niger/overview.

Between June 2007 and November 2012, Mebiame worked on behalf of the Mining Company, the Turks & Caicos Entity and the Joint Venture to obtain and retain rights to uranium-mining concessions in Niger.  (PSR ¶ 6.)  He did so by paying more than $4 million in bribes to high-ranking government officials in Niger ("Niger Official #1" and "Niger Official #2")[3] who had the power to grant uranium-mining licenses.  (PSR ¶ 6.)[4]

B.    Mining Rights in Guinea

Guinea is a country in West Africa with significant mineral resources.  (PSR ¶ 8.)  According to the World Bank, "[p]overty affected about 55% of Guinea's population in 2012, but this percentage is likely to have increased as a result of the Ebola crisis and

---

[3] The government has identified the names and titles of the anonymized government officials in a separate sealed submission to the Court.

[4] The PSR states that Mebiame paid more than $3 million in bribes in Niger.  The government has evidence of more than $4 million in bribes paid in Niger.  See Complaint, 16-M-752 at ¶¶ 17, 21, 23, 26-28.

economic stagnation in 2014 and 2015."  See The World Bank Guinea Country Report,

available at http://www.worldbank.org/en/country/guinea/overview.

Between June 2010 and June 2012, Mebiame engaged in negotiations to obtain

mineral rights and future opportunities for the Turks & Caicos Entity, including the

opportunity to partner with the Guinean state-owned mining company (the "SOMC").  To

this end, Mebiame and his coconspirators were involved in re-writing the Guinean mining

code.  (PSR ¶ 8.)  Mebiame obtained mining opportunities in Guinea because of corrupt

payments he provided to senior government officials, which included an S-class Mercedes

Benz sedan, a $440,000 rental of a private Airbus jet, approximately $150,000 in cash

payments and additional payments for the travel of family members of Guinean government

officials.  (PSR ¶ 8.)

C.      Expropriation of Mining Asset in Chad

Chad is a country in central Africa that "has been plagued by instability. . . .

Chad is ranked 185 out of 188 countries according to the 2015 United Nations Development

Program Human Development Index."  See The World Bank Chad Country Report available

at http://www.worldbank.org/en/country/chad/overview.

Between January 2007 and June 2008, Mebiame obtained the rights to

uranium concessions in Chad on behalf of the Mining Company and the Joint Venture.  (PSR

¶ 7.)  He did so by paying bribes to a high-level government official in Chad ("Chad Official

#1"), whose official duties included advising the President of Chad on mining matters and

awarding mining rights to companies.  (Id.)  Mebiame gave Chad Official #1 cash and paid

for travel expenses and shopping excursions for Chad Official #1 and Chad Official #1's

spouse in Paris, France.  (Id.)

4

Through his corrupt influence, Mebiame was able to convince Chad Official #1 to strip a competing mining company of its assets in Chad so the assets could subsequently be awarded to the Mining Company.  (Id.)  Mebiame explicitly discussed his role in the expropriation of the mining asset in an email to a coconspirator on February 14, 2009:

> CHAD , I agreed to fly the day that the war started with Sudan, to controversialy [sic.] reverse the situation by convincing the Government [through Chad Official #1] to allocate to [the Mining Company] the potentially best block of the country that was ALREADY the property of [the foreign mining company]: This resulted in the fury of [President of European country] during his visit to CHAD PRESIDENT

D.   Mebiame's Personal Compensation for his Corrupt Conduct

Mebiame personally received in excess of $7 million in compensation for his participation in the corrupt scheme.  Mebiame was paid at least $3.7 million, as of June 2009, for his activities in Chad and Niger, including: two payments for a total of $1,364,900 on July 3, 2007, for two houses in Gabon; a $110,623.50 payment on August 7, 2007 for a Bentley luxury car; a $100,000 payment on March 17, 2008 for a car in Gabon; and a $527,000 payment on May 6, 2008 for an apartment in Paris.  (See Ex. A at 12-14.)  Bank records corroborate the June 11, 2009 Letter and reflect additional compensation paid to Mebiame.  (See Schedule of payments, attached as Exhibit B.)  Mebiame received an additional $3,596,815 for his corrupt activities in Guinea.  (See Schedule of payments, attached as Exhibit C.)[5]

---

[5] Mebiame used a substantial portion of these funds for a down payment to purchase a $13.5 million house in Miami.  (See Photographs of Miami home, attached as Exhibit D.) Mebiame sold this house on or about June 24, 2011, in a related party transaction to a coconspirator for $1 million, who paid off the outstanding $12.3 million mortgage for

E.     Mebiame's Interactions with Law Enforcement

On June 17, 2015, Mebiame arrived at Miami International Airport aboard a flight from London, England.  Upon arrival, Mebiame was met by Special Agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") who asked to speak with Mebiame.  He agreed.  At first, Mebiame lied and minimized his participation in the corrupt scheme.  The agents confronted Mebiame with documents and financial records obtained during the course of the investigation that clearly showed Mebiame's participation in the corrupt scheme, after which, Mebiame was more forthcoming with the agents.

One week later, on June 23, 2015, Mebiame met with the government at the United States Attorney's Office in Brooklyn, New York.  At the outset of this meeting, Mebiame again lied and minimized his conduct.  However, after he was confronted with additional incriminating documents, Mebiame became more forthcoming during the remainder of the interview, which lasted a full day.  During this meeting, Mebiame described the corrupt schemes and set forth the narrative of his involvement in Chad, Niger and Guinea.  He admitted to making corrupt payments in each of these countries and described the involvement of others in the schemes.  At the conclusion of the interview, Mebiame appeared fully cooperative with the government's investigation.  Mebiame promised to continue to cooperate with the government's investigation, including potential proactive cooperation.  With this understanding, Mebiame was allowed to travel home.  Shortly after leaving the United States, Mebiame ceased all communications with the agents.

---

Mebiame's benefit.  The coconspirator subsequently sold the Miami house in or about December 2014.

On July 27, 2016, the government learned that Mebiame booked travel to the United States.  Separately, later that same day, Mebiame called an IRS agent and informed the agent that Mebiame intended to travel to the United States and that he had been collecting relevant documents to show the government.  Mebiame arrived to the United States on July 28, 2016.[6]  Based on Mebiame's travel reservation records and hotel records, it appeared to the government that Mebiame was traveling into the United States for holiday rather than to meet with the government.[7]  Mebiame subsequently retained counsel in the United States, who contacted the government on August 8, 2016, more than a week after Mebiame arrived in Miami, concerning a potential meeting with the government.  The government communicated to the defendant's counsel that the government wanted to meet with Mebiame in Brooklyn, New York and that Mebiame was at risk for arrest regardless of his location in the United States.  Mebiame and his counsel agreed to travel to Brooklyn to meet with the government.  Upon meeting in Brooklyn, Mebiame advised the government that the airline had lost his bag that purportedly contained all of the evidence he had been gathering as part of his "cooperation" with the investigation.  Mebiame was arrested on a warrant during that meeting.

---

[6] Contrary to the defendant's sentencing memorandum, Mebiame did not travel to Miami with his then-thirteen-year-old daughter.  Customs and Border Protection records show that Mebiame traveled separately, one-week after his daughter entered the United States.  Hotel records show that Mebiame joined his daughter and the 25-year old daughter of a former high ranking Gabonese official at the 1 Hotel in Miami Beach.  The daughter of the former official had been staying at the hotel at Mebiame's expense since late June 2016.  After his arrest, Mebiame made arrangements with an Air France concierge service he had used in the past to facilitate the travel of his daughter.  Hotel records show that Mebiame arranged to pay for the hotel bill for himself, his daughter and the daughter of the former official, which totaled approximately $21,840, using a combination of credit cards and wire transfers.

[7] This fact is confirmed by the defendant's own sentencing memorandum, which described the purpose of the defendant's travel as a "holiday."  (Def. Sent. Mem. at 9.)

On December 9, 2016, the defendant pleaded guilty before Magistrate Judge Bloom to a single-count information that charged him with conspiring to violate the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-3(a)(1).

II.   Applicable Law

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still required to consider Guidelines ranges in determining sentences, but also may tailor the sentence in light of other statutory concerns.  See 543 U.S. 220 (2005); see also 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume

8

that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

III.    The Application of the Guidelines

    A.    The Guidelines Calculation

        The United States Department of Probation ("Probation") calculated the applicable Guidelines imprisonment range, absent the statutory maximum sentence, as 135 months to 168 months.  (PSR ¶ 57.)  This is the same Guidelines range set forth in the defendant's plea agreement with the government.  (See Plea Agreement ¶ 2.)[8]  Because of the statutory maximum sentence, the defendant's effective Guidelines range is 60 months of imprisonment pursuant to U.S.S.G. § 5G1.1(a).

    B.    The Applicable Guidelines Do Not Overstate the Seriousness of the Defendant's Offense

        The defendant argues that the Guidelines overstate the seriousness of his offense.  (Def. Sent. Mem. at 13-16.)  The government disagrees.  The defendant urges the Court to disregard the Specific Offense Characteristics enhancement called for by U.S.S.G. § 2C1.1(b)(2), which states as follows:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the

---

[8] The government and Probation used slightly different Guidelines calculations, but reached the same result.  Probation used the value of the bribes actually paid by Mebiame, which exceeded $3.5 million.  (PSR ¶ 18.)  The government's Guidelines calculation in the plea agreement was based on Mebiame's receipt of more than $3.5 million in personal compensation for acting as a "fixer" for the Joint Venture and the Mining Company.  (See Plea Agreement ¶ 2.)  This compensation represented the value of the benefit personally received by Mebiame in connection with the scheme.  See U.S.S.G. § 2C1.1(b)(2).

> number of levels from the table in § 2B1.1 (Theft, Property
> Destruction, and Fraud) corresponding to that amount.

U.S.S.G. § 2C1.1(b)(2).

The defendant's argument is flawed for several reasons.  To disregard the applicable Specific Offense Characteristic enhancement and start the sentencing proceeding with an invented Guideline calculation, as the defendant suggests (See Def. Sent. Mem. at 15-16), would run afoul of Gall.  See 552 U.S. at 49 ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  Moreover, ignoring the Specific Offense Characteristic enhancement would mean that the criminal conduct of defendants who pay hundred-dollar bribes to obtain benefits worth thousands of dollars should be viewed the same as defendants who pay million-dollar bribes to obtain benefits worth hundreds of millions of dollars.  The government respectfully submits that such a result would be nonsensical and contrary to the sentencing goals set forth by 18 U.S.C. § 3553(a).  The benefits obtained by the defendant from the criminal conduct and the corresponding societal harm are far greater in the context of million-dollar bribes.  It is entirely appropriate that the Sentencing Commission decided to reflect this difference by including the Specific Offense Characteristic enhancement.

The defendant argues that loss enhancement of U.S.S.G. § 2B1.1 is "an ill-suited proxy for culpability in this case [because § 2B1.1] was designed to apply in most instances when a defendant has caused the dollar value of loss, by, for example, defrauding investors out of their hard-earned money." (Def. Sent. Mem. at 14.).  But that is precisely what happened in this case.  The most direct example being the defendant's role in corruptly influencing Chad Official #1 to strip a mining company of the "best [mining] block" in

10

Chad; a uranium asset worth millions of dollars.  That is simply stealing the asset through

corruption.  The government respectfully submits that the corrupt expropriation in Chad

alone would warrant the Specific Offense Characteristic enhancement as applied in this case.

Thus, even under the defendant's restrictive theory of § 2B1.1, the enhancement is

appropriate.

       Moreover, the defendant's conduct went far beyond the corrupt expropriation

in Chad.  He did not play a tertiary role in the offense conduct; he directly arranged and paid

millions of dollars in bribes and was personally compensated millions of dollars for his

criminal activity.  As a result, governments corruptly awarded assets to the Mining

Company, which never developed the assets.  The Mining Company retained the assets to

justify a valuation of hundreds of millions of dollars while the Joint Venture explored a sale

of the Mining Company.  In a non-corrupt transaction, the governments could have awarded

these same assets to a company that would have developed them, which could have led to the

payments of royalties to benefit the citizens of Chad, Niger and Guinea, which are some of

the poorest countries in the world, rather than corrupt officials in those countries.

       The defendant's reliance on a line of inapposite cases is unavailing.  (Def.

Sent. Mem. at 14-16.)  In this case, the government and Probation based the Specific Offense

Characteristic enhancement on the bribe amount actually paid by the defendant and the

amount of money he put into his own pocket because of his criminal activity.  That was not

the case in United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), where the

government based the loss amount on conduct that largely predated the defendant's

participation in the conspiracy. Id. at 509-10.[9] United States v. Emmenegger, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) is similarly inapposite. In that case, the Court found that the amount of loss caused by a broker-dealer's trading assistant making off-market trades was "a kind of accident[.]" Id. at 427. The Court took issue with how finely the Guidelines sought to distinguish "moral seriousness" based on loss amount, but specifically noted that [t]he rough magnitude of the theft is relevant to sentencing, but the particular amount stolen is not as significant." Id. In this case, the rough magnitude of the defendant's corrupt conduct was at least millions of dollars, which would result in a Guidelines range well above the statutory maximum of 60 months regardless of whether the defendant fell within the different grades of enhancement provided by U.S.S.G. §§ 2B1.1(b)1)(I) or (J). Moreover, as the Court in Emmenegger recognized: "All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment." Id. at 427. The government respectfully submits that the same can be said for large bribes versus small ones.[10]

---

[9] In addition, the loss amount in Adelson, a securities fraud case, was calculated using "the market decline of a publicly traded stock. . . . [which can] generate[] a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart." Id. at 512. That was not the case here where the enhancement is based dollar-for-dollar on the defendant's direct involvement in the corrupt transactions.

[10] United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) is similarly inapposite. In that case, which called for a Guidelines sentence of 360 months to life, Judge Block noted that there was a correlation nationwide between the amount of loss and the length of terms of incarceration imposed at sentencing. Id. at 752 ("Those who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms."). In this case, the government is not seeking a double-digit term of imprisonment even though the defendant corruptly obtained assets valued in excess of $100 million. See supra at 2. The Guidelines in this case call for a 5-year term of imprisonment, which is entirely appropriate given the defendant's conduct. United States v. Mueffelman, 400 F. Supp. 2d 368 (D. Mass 2005) is also inapposite. In that case the Court

IV.      Sentencing Factors under 18 U.S.C. § 3553(a)

        As set forth herein, the nature and circumstances of the defendant's criminal conduct, his history and characteristics, the need to provide for both specific and general deterrence, the need to promote respect for the law and the need to provide just punishment all weigh heavily in favor of a Guidelines sentence.  In addition, contrary to the defendant's argument, a Guidelines sentence would not result in an unwarranted sentencing disparity. For these reasons, the government respectfully requests the Court to impose a Guidelines sentence in this case.

    A.      The Nature and Circumstances of the Offense Warrant a Guidelines Sentence

        The government respectfully submits that the nature and circumstances of the defendant's offense weigh heavily in favor of a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).  In this case, the defendant paid millions of dollars in bribes over years to corrupt government officials at the highest levels of government in at least three African countries to secure mining rights, including uranium-mining rights.  He was paid millions of dollars to do so.  This case is an example of the heartland of foreign corruption prohibited by the FCPA.  The defendant was well aware that his conduct was against the laws of various countries, including the United States.  (See Complaint, 16-M-752 at ¶ 13.)  He repeatedly chose to violate the law for his own personal gain to the detriment of the citizens and institutions in each of Chad, Niger and Guinea.  He also directly participated in corruptly

---

reduced the loss enhancement by three levels because it found the defendant did not actually intend to cause the actual loss incurred by the victims.  Id. at 379.  In this case, the defendant certainly intended to pay more than $3.5 million in bribes and/or receive more than $3.5 million in compensation for his criminal activities.  So there is no issue of intended loss in this case.  Moreover, even a three level reduction would result in a Guidelines range well in excess of the statutory maximum sentence.

expropriating a uranium asset from a company in Chad.  In addition, the defendant laundered the proceeds of his criminal activity into the United States.  (PSR ¶ 4.)  But for the statutory maximum sentence in this case, the defendant would be facing more than ten years of imprisonment for his criminal conduct.  (PSR ¶ 57.)  The government respectfully submits that the serious nature and duration of the defendant's criminal conduct weighs heavily in favor of a Guidelines sentence.[11]  See 18 U.S.C. § 3553(a)(1).

      B.    The History and Characteristics of this Defendant Warrant a Guidelines Sentence

        The government respectfully submits that the defendant's history and characteristics weigh heavily in favor of a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).  The defendant's history and characteristics are largely borne out by the crimes that he committed which were not the product of necessity or passion, but rather greed and repeated deliberate choices.  He used the position of privilege that he was born into as his currency to gain access to leaders at the highest levels of government to bribe them for personal gain.  Mebiame never had a real job and yet was able to obtain millions of dollars through his criminal conduct.  (PSR ¶¶ 5, 51-53; Exs. A-C.)

---

[11] The defendant's argument that he should receive a below Guidelines sentence because he arguably was part of Och-Ziff's larger criminal scheme, which involved a $213 million loss, is unavailing.  The government seeks to hold Mebiame responsible for the conduct he was directly involved in as a central and critical player, which was serious and significant in its own right.  The applicable Guidelines hold him accountable only for the bribes he actually paid or arranged, and the money he obtained for himself because of his criminal conduct.  Thus, the defendant's reliance on the conduct of others in Libya or the Democratic Republic of the Congo as a basis not a non-Guideline sentence is misplaced. (See Def. Sent. Mem. at 11-12.).  Mebiame was central to the criminal conduct at issue and any argument that he was a minor player in this conduct is simply wrong.  Moreover, the government cannot comment on ongoing and active investigations into other individuals who may be charged in connection with this case.

14

Moreover, the defendant reported to Probation that he had assets of only $21,339 (PSR ¶ 54) and yet he was able to arrange to pay a luxury hotel bill of nearly that same amount on the day of his arrest.  The Government does not have visibility into the defendant's banking activity in Gabon, but given his propensity of lying initially when he thinks he can get away with it, the defendant's prior use of his mother's bank account to receive payments (See Exs. B and C), and the amount of money the defendant received during the course of the charged conspiracy, the government has serious questions about the veracity of the defendant's financial reporting to Probation.  (PSR ¶ 54-55.)[12]

The government respectfully submits that the defendant's history and characteristics weigh heavily in favor of a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).

C.    The Need for General and Specific Deterrence Warrants a Guidelines Sentence

The need to afford both adequate general and specific deterrence to criminal conduct weighs heavily in favor of a Guidelines sentence in this case.  See 18 U.S.C. §§ 3553(a)(2)((B), 3553(a)(2)(C).  With respect to general deterrence, the defendant profited handsomely from his criminal conduct and lived a jet-setting lifestyle between three continents, where he kept homes.  He made more than $7 million by participating in the corrupt scheme.  If the penal cost of such lucrative criminal conduct, in the event it is discovered and prosecuted, is only nine months of imprisonment as the defendant requests, the government respectfully submits that the economic incentive to engage in high-dollar value corruption far exceeds any deterrent effect that may result from the prospect of incarceration.  See 18 U.S.C. § 3553(a)(2)(B).

---

[12] The government notes that Mebiame traveled to Miami prior to his arrest in the business class cabin on his transatlantic flight.

15

For this particular defendant, corruption was a way of life.  The defendant's employment record consists of one job: corrupt fixer.  (PSR ¶¶ 52-53.)  From 2001 until the time of his arrest, he reported to hold one job as a self-employed consultant.  (PSR ¶ 52.) From 2007 through 2012, the defendant worked as the corrupt fixer for the Joint Venture and Mining Company as detailed in the offense conduct.  (PSR ¶ 52.)  He provided no description to Probation for his employment between 2001 and 2007.  (PSR ¶ 52-53.)  Prior to 2001, the defendant reported that he worked for his father's business for no compensation and as an oil consultant in South Africa.  (PSR ¶ 53.)  The government respectfully submits that based on its investigation, the defendant has no expertise in the oil industry that would explain the consultancy services he provided apart from corrupt services like those he provided to the Mining Company.  The government respectfully submits that after a lifetime of well-compensated corruption, a sentence of nine months is insufficient to deter the defendant from engaging in future criminal conduct.  See 18 U.S.C. § 3553(a)(2)(C).

The government respectfully submits that the need for the sentence imposed to afford adequate general and specific deterrence to future criminal conduct weighs heavily in favor of a Guidelines sentence.

D.    The Need to Promote Respect for the Law Warrants a Guidelines Sentence

The need for the sentence imposed to promote respect for the law weighs heavily in favor of a Guidelines sentence in this case.  See 18 U.S.C. § 3553(a)(2)(A).  As detailed above, the defendant engaged in a years' long bribery scheme that undercut the rule of law in multiple countries.  A Guidelines sentence would restore some of credibility to the rule of law when the citizens of those countries learn that Mebiame was held accountable for his conduct.

16

Prior to his arrest, the defendant demonstrated little respect for the law.  The defendant himself sent an email threatening a coconspirator with disclosing their corrupt conduct to the press.  (Complaint, 16-M-752 at ¶ 13.)  In this email, Mebiame explicitly stated that the corrupt conduct to acquire the mining rights violated laws in South Africa, England and the United States.  (Id.)  He threatened to go public with this information if he was not paid what he believed he was owed as part of the conspiracy.  (Id.)  The government respectfully submits that the defendant's clear knowledge of the illegal nature of his conduct, his use of the law as a threat to extort his coconspirator for illegal profit and his apparent belief that he could disclose the conduct with impunity for himself, demonstrates his utter lack of respect for the law.

Moreover, his interactions with law enforcement further demonstrate the defendant's lack of respect for the law.  After he was first confronted by law enforcement, Mebiame lied and minimized his involvement in criminal conduct until he was confronted with documents that showed his involvement in the corrupt scheme.  He lied and minimized again, when he met with prosecutors until he was confronted with additional documents.  He did eventually provide the government with a truthful narrative of his conduct and of the conduct of others, largely after he perceived, correctly, that the government knew much about the corrupt scheme already.[13]

---

[13] The information provided by the defendant was useful to help place the documentary trail of corruption developed during the investigation into context.  The government took this benefit into account when it offered the defendant a plea agreement, which allowed him to plead to a single count information with a five-year statutory maximum sentence.

17

The defendant promised to continue to cooperate with U.S. law enforcement. On this basis, he was allowed to return home, only to cease all communications with the investigative team shortly after leaving the United States.  Mebiame was explicitly warned not to mislead the government about his intention to cooperate on an ongoing basis.  He clearly did not take this warning seriously because a year later, he returned to the United States for holiday.  The defendant seemed to believe he could talk or "schmooze" his way out of any problem with U.S. law enforcement.  Upon arriving at the U.S. Attorney's Office, Mebiame tried, unsuccessfully, to deliver a large coffee table book to one of the undersigned Assistants that he had brought from Gabon as a gift.  Mebiame also told a story about how he had been cooperating in his own mind all along, without direction from U.S. law enforcement, and had collected a bag full of incriminating documents that the airline purportedly lost on his trip to Miami.  The government respectfully submits that this story was false.

The need to promote respect for the law weighs heavily in favor of a Guidelines sentence in this case.  See 18 U.S.C. § 3553(a)(2)(A).

E.    The Need to Provide Just Punishment Warrants a Guidelines Sentence

The government respectfully submits that the need for just punishment in this case weighs heavily in favor of a Guidelines sentence.  See 18 U.S.C. § 3553(a)(2)(A).  A Guidelines sentence of 60 months is both measured and just in the context of the defendant's extensive criminal conduct and the harm caused by that conduct.

F.     A Guidelines Sentence would not Result in an Unwarranted Sentencing
       Disparity

The defendant argues that he should receive a below-Guidelines sentence of time-served (nine months) to avoid an unwarranted sentencing disparity.  (Def. Sent. Mem. at 17-21.)  As an initial matter, the government respectfully submits that even if a Guideline sentence in this case would result in an unwarranted disparity, the totality of the sentencing factors weigh in favor of a Guidelines sentence.  As the Second Circuit has stated:

> Among the factors a sentencing court must consider in imposing a sentence is the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  Because § 3553(a)(6) is only one of the several factors that a district court must balance, a district court's identification of disparity does not necessarily require it to adjust a sentence downward from the advisory guidelines range in order for that sentence to be reasonable . . . much less compel any particular reduction.  Rather, the weight to be given such disparities, like the weight to be given any § 3553(a) factor, is a matter firmly committed to the discretion of the sentencing judge . . . so long as the sentence ultimately imposed is reasonable in light of all the circumstances presented.  Moreover, the mandate to take into account nationwide disparities under § 3553(a)(6), as distinct from the need to give due weight to the Guidelines under § 3553(a)(4), is modest.

United States v. Goberdhan, 499 Fed.Appx. 632012, *66-67 (2d Cir. Oct. 1, 2012) available at 2012 WL 4478672 (internal quotation marks and citations omitted) (citing United States v. Florez, 447 F.3d 145, 157–58 (2d Cir.2006); United States v. Wills, 476 F.3d 103, 110 (2d Cir. 2007)).  In any event, the government respectfully submits that a Guidelines sentence would not result an unwarranted disparity.

To support his disparity argument, the defendant cited to statistics from 2015, which show that the median sentence for all federal defendants sentenced for "bribery"

19

(including cooperating witnesses who received letters pursuant to § 5K1.1) was 18 months. (Def. Sent. Mem. at 18, citing 2015 Sourcebook of Federal Sentencing Statistics.)  The average sentence for these same defendants was 27 months of imprisonment.  See United States Sentencing Commission, Sourcebook 2015, Table 13.  These statistics fail to account for the fact that in almost 40 percent of these bribery cases, the government moved for a below-Guidelines sentence, presumably via a § 5K1.1 motion.  See id. at Table 27A.  After excluding defendants who received no jail time at sentencing (likely including many but not all of the cooperating defendants), the median sentence for all federal defendants sentenced for "bribery" was 29 months; the average sentence was 38 months.  See United States Sentencing Commission, Sourcebook 2015, Table 14.  These statistics do not differentiate based on the size or number of the bribes paid, the length of the bribery scheme, or the level of the officials who received the bribes.  What these statistics show, if anything, is that the defendant's request for a sentence of time-served would create an unwarranted disparity by being too lenient.

In further support of his argument, the defendant cites to a selection of cases in which the defendants received lenient sentences.  (Def. Sent. Mem. at 19-20.)  In many of the cases, the conduct of the defendants did not rise to the level of Mebiame's criminal conduct. Moreover, the government can cite to countervailing cases.

For example, defendant Charles Jumet was sentenced, after pleading guilty, to 87 months in prison for paying bribes to Panamanian government officials to secure maritime contracts, in violation of the FCPA and for making a false statement to federal agents in connection therewith.  From approximately 1997 through July 2003, Jumet and others conspired to pay money secretly to Panamanian government officials in exchange for

20

awarding contracts to Ports Engineering Consultants Corporation (PECC) to maintain

lighthouses and buoys along Panama's waterway.  In December 1997, the Panamanian

government awarded PECC a no-bid 20-year concession.  Jumet admitted that he and others

authorized corrupt payments to be made to the Panamanian government officials to obtain

the concession.  In total, Jumet and others caused corrupt payments of more than $200,000 to

be paid to the former administrator and the former deputy administrator of the Panama

Maritime Authority and to a former high-ranking elected executive official of the Republic

of Panama.  See United States v. Jumet, 09-CR-397 (E.D.Va.).  John Warwick, Jumet's 64-

year old coconspirator in the PECC corrupt scheme was sentenced to 37 months'

imprisonment after pleading guilty to a conspiracy to violate the FCPA.  See United States v.

Warwick, 09-CR-449 (E.D.Va.).

        More recently, Benito Chinea, the former chief executive officer of Direct

Access Partners, a U.S. broker-dealer, and Joseph DeMeneses, a former managing director of

Direct Access Partners, were sentenced to terms of imprisonment of four years each for their

roles in a scheme to bribe a senior official in Venezuela's state economic development bank,

Banco de Desarrollo Económico y Social de Venezuela (Bandes), in return for trading

business that generated more than $60 million in commissions.  See United States v. Chinea,

et. al., 14-CR-240 (S.D.N.Y.).

        Similarly, in the so-called "LatiNode" bribery scheme, the lead defendant

Jorge Granados was sentenced to 46 months' imprisonment after pleading guilty to

conspiring to violate the FCPA.  Granados, the ex-chief executive officer of a

telecommunications company, admitted to authorizing more than $500,000 in corrupt

payments to Honduran government officials for the purpose of securing business advantages

for his company from Honduras's state-owned telecommunications company.  See United States v. Granados, 10-CR-20881 (S.D.Fla.).

In a case that involved corruption at the Haitian state-owned telecommunications company ("Haiti Teleco"), Joel Esquenazi, the former president of a Terra Telecommunications Corp. ("Terra"), a private telecommunications company, and Carlos Rodriguez, the former vice-president of Terra, were sentenced after trial to terms of imprisonment of 15-years and 7-years respectively for their roles in an FCPA bribery and money-laundering conspiracy.  The case involved a scheme in which Terra paid approximately $890,000 to shell companies to be used to pay bribes to Hati Teleco executives, who were Haitian foreign officials.

In the present case, the defendant's criminal conduct was far more extensive than that of the defendants in the PECC, Direct Access Partners, LatiNode or Hati Teleco cases.  Mebiame paid millions of dollars in bribes, not hundreds of thousands of dollars; he bribed the most senior officials in the governments of three countries, not executives of state-owned enterprises in one country, he personally profited more than $7 million from his criminal conduct and he corruptly obtained assets worth hundreds of millions of dollars. These facts differentiate Mebiame's conduct from much of the conduct in other FCPA cases; the government respectfully submits that any disparity that may exist with those cases would be warranted.

CONCLUSION

For the foregoing reasons, the government respectfully submits that the Court

impose a Guidelines sentence.

Dated: April 28, 2017

Respectfully submitted,

ANDREW WEISSMANN                    BRIDGET M. ROHDE
Chief, Fraud Section                Acting United States Attorney
U.S. Department of Justice          Eastern District of New York
1400 New York Avenue, NW            271 Cadman Plaza East
Washington, D.C. 20005              Brooklyn, New York 11201


By:    _____/s/_____      By:    _____/s/_____
       Leo Tsao                            James P. Loonam
       Assistant Chief, FCPA Unit          David Pitluck
       James McDonald                      Jonathan Lax
       Trial Attorney                      Assistant United States Attorneys
       202-514-2000                        718-254-7000

23