DATE:      11 JUNE 2009

TO:        WHOM IT MAY CONCERN

RE:        SAMMY MEBIAME

Dear All

Kindly note that the current position relating to the value of Sammy's contract is as follows:

1. In terms of the Service Provider Agreement concluded with Sammy, he receives a "beneficial interest" of 1% in mineral resources and 1% in oil & gas projects by ▬ in Africa.
2. The agreement further determines that "*the particular beneficial shares will accrue to the Service Provider once a project has become cash positive on a cumulative basis*".
3. According to the latest Investment Valuation done by ▬ the value of ▬ amounts to $240 038 303 as at 31 March 2009. One percent thereof amounts to $2 400 383.
4. Payments made to Sammy amounts to $3 769 960.

Yours truly,

A-1

service provider agreement

(Q):SIG9/0009
29.6.2007

Between _____

[redacted]

and

Samuel Francis Meblame
Passport No. [redacted]

[signature: SM]

A-2

2

INTERPRETATION

1. In this Agreement, unless the context indicates otherwise:

    1.1 "Agreement" means the agreement herein contained including annexures hereto;

    1.2 "Business Day" means any day other than a Saturday, Sunday or public holiday officially recognised as such in the country were the Service Provider renders the Services in terms of this Agreement;

    1.3 "Commencement Date" means Date of Signature Date of the Agreement;

    1.4 "Company" means ███████████████████████

    1.5 "Company Representative" means the Chief Executive Officer of the Company from time to time or such other person as the Company may nominate from time to time;

    1.6 "Services" means the Services as further described in clause 9 below and will include Mining Consultancy Services as well as Oil Consultancy Services to be rendered by the Service Provider to the Company or any of the Company's affiliates in terms of this Agreement;

    1.7 "Service Provider" means Samuel Francis Mebiame Passport Nr ███████, of _____;

    1.8 "Signature Date" means the date on which the last party signing this Agreement does so;

    1.9 "Termination Date" means <insert>, unless the parties mutually agree otherwise in writing.

2. The headnotes to the paragraphs to this Agreement are inserted for reference purposes only and shall not affect the interpretation of any of the provisions to which they relate.

3. Words importing the singular shall include the plural and vice versa, and words importing the masculine gender shall include the female gender and words importing persons shall include partnerships and bodies corporate.

4. Terms defined in this Agreement shall bear the same meaning in the schedules and annexures hereto.



3

## INTRODUCTION & SCOPE OF APPOINTMENT

5. The Company wishes to appoint the Service Provider to provide Services and the Service Provider wishes to accept such appointment.

6. The parties wish to enter into this Agreement recording and regulating the terms and conditions of the appointment and certain matters incidental thereto.

7. The Service Provider's appointment is on an independent contractor basis and this Agreement shall not be construed in any way to constitute an employer/employee, agency, joint venture or partnership arrangement in any shape or form between the parties, or authorise either party to incur any liability whatsoever on behalf of the other, it being agreed that the Service Provider shall at all times act as an independent contractor to the Company. It is agreed that this agreement is exclusive and the Service Provider will not contract with or consult to other entities.

## PERIOD OF THE APPOINTMENT

8. This appointment shall commence on the Commencement Date and continue until the Termination Date, subject to clause 25.

## THE SERVICES

9. The Service Provider shall in pursuance of the appointment in terms hereof:

    9.1 render such Services as may reasonably be required of the Service Provider to the Company from time to time in terms of this Agreement;

    9.2 render the Services in accordance with the terms of this Agreement;

    9.3 liaise on all matters relating to its relationship with, and Services provided to the Company, with the Company Representative.

    9.4 use its best endeavours to promote the Company's interests;

    9.5 exercise the utmost good faith towards the Company both in rendering the Services herein and also in all the Service Provider's dealings with the Company;

    9.6 exercise all reasonable skill, care and diligence in the discharge of the Service Provider's obligations in terms of this Agreement.



A-4

4

9.7 Without derogating from the generality of anything else contained in this clause or the remainder of the agreement, the Service Provider's duties will include project identification and sourcing, general facilitating, procuring and arranging relevant licenses and/or other formal requirements, attending on and facilitating the implementation of exploration and exploitation, handling all administrative functions including accounting and budget systems, and generally fulfilling the function of a general manager responsible for all business, administrative and related affairs of the Company.

10. In the event of the Service Provider being unable to provide any of the Services referred to in above, the Service Provider shall notify the Company Representative without delay, at which stage action to rectify the situation shall be agreed between the Service Provider and the Company.

**CONSIDERATION / SHARES**

11. As consideration for the Services rendered by the Service provider, the Company hereby agrees to remunerate the Service Provider as follows:

   11.1 The Service Provider will receive a 7.5% (seven comma five percent) beneficial interest (as defined below) in the ▮▮▮▮▮▮▮▮▮▮ in ▮▮▮▮▮▮▮▮▮▮ ;

   11.2 The Service Provider will receive a beneficial interest of 1% (one percent) in any other mineral resources projects (current and future) of the Company or its affiliates in Africa ;

   11.3 The Service Provider will receive a beneficial interest of 1% (one percent) in respect of any oil and gas opportunities (current and future) of the Company or its affiliates in Africa .

   11.4 For the purposes of 11.1 to 11.3 above a "beneficial interest" will equate to an unregistered shareholding in the Company or its subsidiary (where applicable) or any of the projects referred to in 11.1 to 11.3 above, as the case may be. Such share will not give the Service Provider any voting rights nor any rights to dividends, but the Service Provider will benefit from the capital value of such a share / interest.

   11.5 In the latter regard the Service Provider will share in the liquidated proceeds of the sale of capital assets and/or the business of the Company (or its subsidiaries) and/or any of the projects referred to in 11.1 to 11.3 to the extent of the stipulated percentage.



A-5

5

11.6  The Service Provider may also dispose of such beneficial interest to a third party (subject to 11.7 below), but subject to the right of the Company to purchase the shares so offered on 30 (thirty) days written notice by the Service Provider (and on the basis that the terms offered by the third party must be conveyed to the Company in the notice and the Company may then buy on the same terms). Thereafter the Service Provider may not sell to the outsider on any more favourable terms.

11.7  The Service Provider's right to sell as aforesaid only commences after the lapsing of a period of 3 (three) years from the date hereof.

11.8  The beneficial share in respect of ▓▓▓▓ in terms of 11.1 above will accrue in favour of the Service Provider after 1 (one) year of diligent and effective service in accordance with this agreement, but will be forfeited (wholly or partially and in the discretion of the Company) in the event of the Service Provider thereafter failing to perform in terms hereof (the share then simply falling away, wholly or partially).

11.9  In the instances referred to in 11.2 and 11.3 above the particular beneficial share will accrue to the Service Provider once a project has become cash positive on a cumulative basis. This allocation will also be subject to the Service Provider complying with all its obligations in terms of this agreement including to provide services in respect of the projects referred to in 11.2 and 11.3 (once again forfeiting on the same basis as 11.8 above if he does not duly perform after the allocation of the beneficial share).

11.10  The discretion of the Company to procure the forfeiture of the beneficial shares in terms hereof is absolute and may be exercised retrospectively.

11.11  The beneficial shares in terms hereof attach to the Service Provider personally only and falls away immediately upon his death or permanent disability or if his estate is sequestrated (including provisionally).

11.12  In a "come along" scenario where an outsider has offered to buy all the shares in the Company (or a particular subsidiary) and the other shareholders wish to accept such offer, the Service Provider will be obliged to follow the transaction and agrees in advance to such sale (including of his beneficial interest).

11.13  Should the Company in its discretion determine that persons or parties other than the Service Provider were materially involved in any of the projects referred to in 11.1 to 11.3 the Company may (in its discretion) award to such other persons or parties 0,3% of the



A-6

6

      Service Provider's beneficial interest (or part thereof). The nature and extent and the terms involved in such share allocations will be in the discretion of the Company.

11.14 Where not specifically mentioned in this clause and where applicable, any reference to the Company is *mutatis mutandis* a reference to the Company's subsidiary, and any reference to an "affiliate" is a reference to a subsidiary.

11.15 It is recorded that any interest / share allocation in terms hereof is in lieu of remuneration for the Service Provider's services, and the Service Provider is liable for any taxes and deductions that may be applicable to such allocation. The value of the interest at the time (as determined by the auditors) will be tax deductible in the hands of the Company, with the Company allocating the share in exchange for the remuneration reintroduced by the Service Provider as payment for the share/interest.

11.16 This agreement is subject to the written consent of the other shareholders of the Company and its subsidiaries (where applicable).

## COMPANY FACILITIES

12. The Service Provider may make use of the Company facilities for the purpose of rendering the Services.

13. The Service Provider is obliged to:

13.1 abide by the standard health, safety and security measures as prescribed by the Company from time to time; and

13.2 utilise such facilities entirely at its own risk, it being specifically agreed that the Company shall not be liable to the Service Provider for any loss or damage whatsoever or howsoever caused arising out of or in connection with the use of such facilities (including through negligence).

14. It is specifically recorded that the Service Provider shall not use the Company's facilities for any other purpose than providing the Services.

## RESTRAINT AND EXCLUSIVITY

15. For the duration of this agreement the Service Provider will not compete with and will not do any work for or with any of the customers or contacts of the Company or its affiliates.



A-7

7

16. For the duration of this agreement the consultant undertakes to provide services and to consult exclusively for and to the Company or its affiliates and during this period he will not advise nor deal with any parties in the relevant field other than the Company (or its affiliates). The consultant accepts that if he does so and a Project is awarded to another party, he will be liable for damages suffered by the Company (or its affiliates) which will include the Company's (or its affiliates') loss of profit that it would have earned from the particular Project.

**CONFLICT OF INTEREST**

17. The Service Provider agrees and undertakes in favour of the Company to declare and disclose to the Company during the currency of the Agreement, any of its other interests and activities which, with regards to the nature of the Services and the Company's operations, are or may potentially be in conflict with the Company's interests or which would distract from the proper fulfilment of its obligations in respect of the Services.

**CONFIDENTIALITY**

18. The Service Provider shall at all times keep confidential any and all materials and information which it may acquire in relation to the business or affairs of the Company, whether pursuant to this Agreement or otherwise, ("the Company Information"), including, without limitation, financial information, and information and materials about the Company's operations, strategic and tactical plans.

19. The Service Provider shall not use or disclose the Company Information except:

    19.1  with the prior consent of the Company (which consent may be withheld by the Company in its sole discretion); or

    19.2  to the extent as may be necessary to effectually render the Services; or

    19.3  in accordance with the order of a court of competent jurisdiction.

20. The obligations of the Service Provider contained in clauses 16 and 19 above, shall continue without limit in point of time but shall cease to apply to any Information coming into the public domain otherwise than by breach of the Service Provider of its obligations contained in this Agreement.

21. The Service Provider undertakes to the Company that all Company Information and any Company documents or records (including,



A-8

8

without limitation, written instructions, drawings, notes or memoranda, relating to the business or affairs of the Company which come into the Service Provider's possession during the currency of this Agreement), shall be deemed to be the sole and exclusive property of the Company and shall be surrendered to the Company on demand, and in any event, on the termination of this Agreement for any reason whatsoever and the Service Provider will not retain any copies thereof or extracts there from, except drawings notes or memorandum of which the Service Provider is the author.

### SERVICE PROVIDER'S PERSONNEL

22. The Service Provider warrants and undertakes that all of its personnel, including the Service Provider, shall be and remain bound by the provisions of this Agreement as fully and effectually as if they were signatories hereto.

23. The Service Provider shall procure written covenants from such personnel referred to in clause 22 above, upon the terms and subject to the conditions set forth in this Agreement, mutatis mutandis, if so required by the Company at any time.

### NO CESSION AND ASSIGNMENT

24. It is expressly recorded and agreed that the rights afforded herein are personal to the Service Provider. The Service Provider shall not be entitled to sell, cede, assign, delegate or in any other way alienate or dispose of any of its rights or obligations under this Agreement without the prior written consent of the Company.

### BREACH

25. Should either party breach any term or condition of this Agreement and fail to remedy such breach within a period of 30 (thirty) days after receipt of written notice requiring it to remedy such breach, then the aggrieved party may either enforce the contents of this Agreement against the defaulting party or cancel this Agreement and claim such damages as it may actually have sustained. The defaulting party shall pay the costs of the aggrieved party.

### POST TERMINATION PROVISIONS

26. Upon termination of this Agreement for any other reason whatsoever (and without prejudice to any other rights or remedies of the Company under this Agreement or in law), the Service Provider shall forthwith cease to provide the Services, and will not be entitled to any remunderation.



A-9

9

### GOOD FAITH

27. In the implementation of this agreement, the parties undertake to observe the utmost good faith and they warrant in their dealings with each other that they shall neither do anything nor refrain from doing anything which might prejudice or detract from the rights, assets or interests of either of them.

### NOTICES AND DOMICILIA

28. The parties respectively elect their addresses reflected in clauses 1.4 and 1.6 above for purposes of notices and correspondence to be given in terms of this Agreement and they respectively elect said addresses as their *domicilium citandi et executandi* ("domicilium").

29. Either party may at any time, by notice in writing to the other party, change its domicilium to any other address which is not a post office box or *post restante*.

30. Any notice given in connection with this Agreement shall be delivered by hand to the domicilium chosen by the party concerned.

31. A notice given as set out above shall be deemed to have been duly given (unless the contrary is proved) if delivered by hand, on the date of delivery.

### UNITED KINGDOM LAW

32. This Agreement shall be governed by and construed in accordance with the laws of the United Kingdom.

### GENERAL PROVISIONS

33. No concession, indulgence or additional benefit which the Company may at any time grant to the Service Provider shall be deemed to constitute a novation or an amendment of this Agreement or a waiver of the rights of the Company hereunder.

34. No agreement purporting to vary the terms and conditions hereof shall be of any force and effect unless reduced to writing and signed by the parties hereto.

35. This document contains the entire agreement between the parties relating to the subject matter hereof and neither party shall be bound by any undertakings, representations, warranties, promises or the like not recorded herein.



A-10

10

## COSTS

36. The costs of the preparation of this Agreement shall be borne by the Company and the Service Provider in equal shares.

Dated at JOHANNESBURG on this 03 day of 07 - 2007

As Witnesses:    for:

1.

2.

Dated at          on this    day of      2007

As Witnesses:   for:    **SAMUEL MEBIAME**

1. A.M. DE Oliveira -
2. Ce Cu Oliveira

Who warrants that he/she is duly authorised thereto

CAPACITY: _____

NAME:    SAMUEL-Francis MEBIANE

A-11

## SUMMARY OF PAYMENTS MADE TO SAMEUL MEBIAME

| DATE | DETAILS | ACCOUNT | USD | GBP | ZAR | EUR |
|---|---|---|---|---|---|---|
| 2006/06/05 | MME ALICE | | $30,000.00 | | | |
| 2006/06/09 | ALICE MB TRF | | | £3,453.04 | | |
| 2006/08/03 | MME ALICE | | $4,954.45 | | | |
| 2006/09/28 | ALICE MB TRF | | | £4,285.24 | | |
| 2006/10/31 | MME ALICE | | $100,015.00 | | | |
| 2006/11/14 | MME ALICE | | | | | € 5,025.00 |
| 2006/11/28 | ALICE MB TRF | | | £5,209.69 | | |
| 2006/11/28 | ALICE MB TRF | | | £5,178.66 | | |
| 2006/11/29 | MME ALICE | | $5,890.61 | | | |
| 2006/12/01 | ALICE MB TRF | | | £3,417.64 | | |
| 2007/02/28 | MME ALICE | | $3,435.25 | | | |
| 2007/04/05 | MME ALICE | | $70,070.00 | | | |
| 2007/04/30 | MME ALICE | | $100,100.00 | | | |
| 2007/07/03 | CONSEIL PLUS (HOUSE IN GABON) | | $532,589.44 | | | |
| 2007/07/03 | IMP CONSEIL LTD (BALANCE HOUE GABON) | | $832,310.56 | | | |
| 2007/08/07 | BENTLEY PAYMENT | | $110,623.50 | | | |
| 2007/09/20 | DUBAI HOTEL | | | | | € 50,000.00 |
| 2007/09/27 | S MEBIAME | | | | | € 150,000.00 |
| 2007/10/12 | S MEBIAME | | | | | € 150,000.00 |
| 2007/10/17 | FUNDS RETURNED | | | | | € -149,950.00 |
| 2007/10/18 | S MEBIAME | | $400,000.00 | | | |
| 2007/10/24 | S MEBIAME (MUTAI) | | $40,000.00 | | | |
| 2007/11/02 | S MEBIAME | | | | | € 60,000.00 |
| 2007/11/08 | INDOJET TRAVEL | | | | R 87,050.00 | |
| 2007/11/08 | INDOJET TRAVEL | | | | R 60,527.00 | |
| 2007/12/06 | INDOJET TRAVEL | | | | R 48,808.00 | |
| 2007/12/06 | INDOJET TRAVEL | | | | R 58,498.00 | |
| 2007/12/07 | INDOJET TRAVEL | | | | R 155,966.00 | |
| 2008/01/08 | SAMMY PARIS TRAVEL | | | | | € 9,000.00 |
| 2008/03/17 | S MEBIAME - PURCHASE OF GABON CAR | | $100,000.00 | | | |
| 2008/05/06 | HAGUENAUR - MEBIAME APARTMENT (PARIS) | | $527,000.00 | | | |
| 2008/07/23 | CASH GIVEN TO SAMMY - LONDON | | $7,950.00 | | | |
| 2008/11/07 | FRANK KNIGHT - APARTMENT VALUATION | | -$9,367.40 | | | |
| 2008/12/15 | S MEBIAME | | $48,720.14 | | | |
| 2008/03/03 | S MEBIAME | | $10,000.00 | | | |
| APRIL 2009 | S MEBIAME | | $5,000.00 | | | |
| MAY 2009 | S MEBIAME | | $5,000.00 | | | |
| NOV 2007 | SAMMY SA CELLPHONE | | | | R 1,643.54 | |
| DEC 2007 | SAMMY SA CELLPHONE | | | | R 826.60 | |
| JAN 2008 | SAMMY SA CELLPHONE | | | | R 826.60 | |
| FEB 2008 | SAMMY SA CELLPHONE | | | | R 18,576.03 | |
| MAR 2008 | SAMMY SA CELLPHONE | | | | R 29,922.07 | |
| APR 2008 | SAMMY SA CELLPHONE | | | | R 25,646.77 | |
| MAY 2008 | SAMMY SA CELLPHONE | | | | R 74,977.92 | |
| JUNE 2008 | SAMMY SA CELLPHONE | | | | R 67,692.66 | |
| JULY 2008 | SAMMY SA CELLPHONE | | | | R 68,270.76 | |
| AUG 2008 | SAMMY SA CELLPHONE | | | | R 9,064.03 | |
| SEPT 2008 | SAMMY SA CELLPHONE | | | | R 23,149.76 | |
| OCT 2008 | SAMMY SA CELLPHONE | | | | R 25,620.43 | |
| NOV 2008 | SAMMY SA CELLPHONE | | | | R 12,464.58 | |
| DEC 2008 | SAMMY SA CELLPHONE | | | | R 7,829.83 | |
| JAN 2009 | SAMMY SA CELLPHONE | | | | R 4,193.23 | |
| FEB 2009 | SAMMY SA CELLPHONE | | | | R 2,705.77 | |
| MAR 2009 | SAMMY SA CELLPHONE | | | | R 11,943.18 | |
| APRIL 2009 | SAMMY SA CELLPHONE | | | | R 11,602.43 | |
| 2007/07/13 | Air France | | | | R 39,008.00 | |
| 2007/07/16 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/07/16 | IndoJet Sure | | | | R 750.00 | |
| 2007/07/27 | Air France | | | | R 5,637.00 | |
| 2007/07/30 | IndoJet Sure | | | | R 1,200.00 | |
| 2007/07/30 | IndoJet Sure | | | | R 600.00 | |
| 2007/08/03 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/08/03 | IndoJet Sure | | | | R 750.00 | |
| 2007/08/06 | IndoJet Sure | | | | R 500.00 | |
| 2007/08/06 | IndoJet Sure | | | | R 450.00 | |
| 2007/08/03 | Air France | | | | R 3,560.00 | |
| 2007/08/03 | Air France | | | | R 40,183.00 | |
| 2007/08/17 | Air France | | | | R 37,430.00 | |
| 2007/08/20 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/08/20 | IndoJet Sure | | | | R 750.00 | |
| 2007/08/25 | Air France | | | | R 43,161.00 | |
| 2007/08/28 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/08/28 | IndoJet Sure | | | | R 1,050.00 | |
| 2007/09/06 | Air France | | | | R 27,657.00 | |
| 2007/09/07 | Air France | | | | R 31,532.00 | |
| 2007/09/11 | IndoJet Sure | | | | R 2,000.00 | |
| 2007/09/11 | IndoJet Sure | | | | R 750.00 | |
| 2007/09/11 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/09/11 | IndoJet Sure | | | | R 750.00 | |
| 2007/09/14 | Air France | | | | R 11,109.00 | |
| 2007/09/18 | IndoJet Sure | | | | R 2,500.00 | |
| 2007/09/18 | IndoJet Sure | | | | R 300.00 | |
| 2007/09/24 | Air France | | | | R 18,710.00 | |
| 2007/09/24 | Air France | | | | R 45,852.00 | |
| 2007/09/28 | Air France | | | | R 56,130.00 | |

## SUMMARY OF PAYMENTS MADE TO SAMEUL MEBIAME

| DATE | DETAILS | ACCOUNT | USD | GBP | ZAR | EUR |
|---|---|---|---|---|---|---|
| 2007/10/01 | IndoJet Sure | | | | R 4,000.00 | |
| 2007/10/01 | IndoJet Sure | | | | R 300.00 | |
| 2007/10/01 | IndoJet Sure | | | | R 1,000.00 | |
| 2007/10/01 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/10/01 | IndoJet Sure | | | | R 750.00 | |
| 2007/10/12 | Air France | | | | R 57,899.00 | |
| 2007/10/17 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/10/17 | IndoJet Sure | | | | R 750.00 | |
| 2007/10/18 | Air France | | | | R 46,859.00 | |
| 2007/10/18 | Air France | | | | R 10,275.00 | |
| 2007/10/19 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/10/19 | IndoJet Sure | | | | R 750.00 | |
| 2007/10/31 | British Airways | | | | R 2,481.00 | |
| 2007/10/31 | IndoJet Sure | | | | R 285.00 | |
| 2007/10/31 | IndoJet Sure | | | | R 188.10 | |
| 2007/11/01 | SAA | | | | R 20,285.00 | |
| 2007/11/01 | SAA | | | | R 2,342.00 | |
| 2007/11/02 | IndoJet Sure | | | | R 1,000.00 | |
| 2007/11/02 | IndoJet Sure | | | | R 600.00 | |
| 2007/11/08 | Air France | | | | R 56,277.00 | |
| 2007/11/12 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/11/12 | IndoJet Sure | | | | R 750.00 | |
| 2007/11/16 | Air France | | | | R 58,147.00 | |
| 2007/11/19 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/11/19 | IndoJet Sure | | | | R 750.00 | |
| 2007/12/06 | Air France | | | | R 16,611.00 | |
| 2007/12/07 | Air France | | | | R 61,879.00 | |
| 2007/12/07 | Air France | | | | R 58,498.00 | |
| 2007/12/10 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/12/10 | IndoJet Sure | | | | R 750.00 | |
| 2007/12/10 | IndoJet Sure | | | | R 1,600.00 | |
| 2007/12/10 | IndoJet Sure | | | | R 600.00 | |
| 2007/12/12 | IndoJet Sure | | | | R 3,500.00 | |
| 2007/12/12 | IndoJet Sure | | | | R 750.00 | |
| 2007/12/12 | IndoJet Sure | | | | R 4,500.00 | |
| 2007/12/12 | IndoJet Sure | | | | R 750.00 | |
| 2007/12/12 | IndoJet Sure | | | | R 9,185.51 | |
| 2007/12/12 | IndoJet Sure | | | | R 199.50 | |
| 2007/12/10 | American Airlines | | | | R 77,983.00 | |
| 2008/01/04 | Air France | | | | R 4,328.00 | |
| 2008/01/14 | IndoJet Sure | | | | R 1,000.00 | |
| 2008/01/14 | IndoJet Sure | | | | R 600.00 | |
| 2008/01/17 | Air France | | | | R 54,256.00 | |
| 2008/01/20 | Air France | | | | R 65,450.00 | |
| 2008/01/18 | American Airlines | | | | -R 77,983.00 | |
| 2008/01/21 | IndoJet Sure | | | | R 4,000.00 | |
| 2008/01/21 | IndoJet Sure | | | | R 900.00 | |
| 2008/01/23 | Air France | | | | R 5,387.00 | |
| 2008/01/23 | IndoJet Sure | | | | R 4,000.00 | |
| 2008/01/23 | IndoJet Sure | | | | R 900.00 | |
| 2008/01/23 | IndoJet Sure | | | | R 300.00 | |
| 2008/01/30 | Air France | | | | R 43,317.00 | |
| 2008/01/29 | IndoJet Sure | | | | R 800.00 | |
| 2008/01/29 | IndoJet Sure | | | | R 350.00 | |
| 2008/01/30 | IndoJet Sure | | | | R 3,500.00 | |
| 2008/01/30 | IndoJet Sure | | | | R 900.00 | |
| 2008/02/07 | IndoJet Sure | | | | R 4,000.00 | |
| 2008/02/07 | IndoJet Sure | | | | R 850.00 | |
| 2008/02/12 | IndoJet Sure | | | | R 342.00 | |
| 2008/02/22 | Air France | | | | R 60,144.00 | |
| 2008/03/12 | Air France | | | | R 31,785.00 | |
| 2008/03/12 | Air France | | | | R 69,459.00 | |
| 2008/03/12 | IndoJet Sure | | | | R 5,653.50 | |
| 2008/03/12 | IndoJet Sure | | | | R 6,575.83 | |
| 2008/03/12 | IndoJet Sure | | | | R 199.50 | |
| 2008/03/12 | IndoJet Sure | | | | R 5,000.00 | |
| 2008/03/12 | IndoJet Sure | | | | R 900.00 | |
| 2008/03/26 | Air France | | | | R 75,393.00 | |
| 2008/03/28 | IndoJet Sure | | | | R 3,500.00 | |
| 2008/03/28 | IndoJet Sure | | | | R 750.00 | |
| 2008/04/03 | IndoJet Sure | | | | R 257.00 | |
| 2008/04/03 | IndoJet Sure | | | | R 285.00 | |
| 2008/04/07 | Air France | | | | R 75,420.00 | |
| 2008/04/09 | IndoJet Sure | | | | R 3,500.00 | |
| 2008/04/09 | IndoJet Sure | | | | R 750.00 | |
| 2008/04/24 | IndoJet Sure | | | | R 7,681.00 | |
| 2008/04/24 | IndoJet Sure | | | | R 199.50 | |
| 2008/05/13 | Air France | | | | R 73,930.00 | |
| 2008/05/16 | IndoJet Sure | | | | R 3,800.00 | |
| 2008/05/16 | IndoJet Sure | | | | R 750.00 | |
| 2008/05/22 | Air France | | | | R 3,950.00 | |
| 2008/05/25 | Emirates Airlines | | | | R 42,339.00 | |
| 2008/05/29 | IndoJet Sure | | | | R 500.00 | |
| 2008/05/29 | IndoJet Sure | | | | R 200.00 | |
| 2008/06/02 | IndoJet Sure | | | | R 3,500.00 | |

A-13

## SUMMARY OF PAYMENTS MADE TO SAMEUL MEBIAME

| DATE | DETAILS | ACCOUNT | USD | GBP | ZAR | EUR |
|---|---|---|---|---|---|---|
| 2008/06/02 | IndoJet Sure | | | | R 750.00 | |
| 2008/06/06 | IndoJet Sure | | | | -R 257.00 | |
| 2008/06/06 | IndoJet Sure | | | | -R 285.00 | |
| 2008/06/09 | Air France | | | | R 71,706.00 | |
| 2008/06/13 | Air France | | | | R 10,427.00 | |
| 2008/06/17 | IndoJet Sure | | | | R 3,500.00 | |
| 2008/06/17 | IndoJet Sure | | | | R 750.00 | |
| 2008/06/17 | IndoJet Sure | | | | R 500.00 | |
| 2008/06/17 | IndoJet Sure | | | | R 200.00 | |
| 2008/06/20 | Air France | | | | R 83,332.00 | |
| 2008/06/24 | IndoJet Sure | | | | R 3,500.00 | |
| 2008/06/24 | IndoJet Sure | | | | R 750.00 | |
| 2008/07/15 | Air France | | | | R 72,526.00 | |
| 2008/07/17 | IndoJet Sure | | | | R 3,500.00 | |
| 2008/07/17 | IndoJet Sure | | | | R 750.00 | |
| 2008/08/26 | Air France | | | | R 71,580.00 | |
| 2008/08/30 | Grand Hotel Int Co France | | | | R 92,699.88 | |
| 2008/09/02 | Air France | | | | R 27,199.00 | |
| 2008/09/06 | Grand Hotel Int. Co France | | | | R 13,200.00 | |
| 2008/09/18 | Air France | | | | R 38,577.00 | |
| 2008/10/11 | British Airways | | | | R 75,814.00 | |
| 2008/11/18 | IndoJet Sure | | | | R 55,714.00 | |
| 2008/11/18 | IndoJet Sure | | | | R 3,500.00 | |
| 2008/11/18 | IndoJet Sure | | | | R 750.00 | |
| 2009/01/25 | Air France | | | | R 57,468.00 | |
| 2009/01/25 | Air France | | | | R 62,774.00 | |
| 2009/02/04 | SAA | | | | R 28,163.00 | |
| 2008/02/10 | SAA | | | | R 490.00 | |
| 2009/02/10 | SAA | | | | R 7,371.00 | |
| 2009/03/01 | Air France | | | | R 57,987.00 | |
| 2009/03/01 | INDOJET TRAVEL | | | | R 3,500.00 | |
| 2009/03/01 | INDOJET TRAVEL | | | | R 750.00 | |
| 2009/03/03 | Air France | | | | R 67,797.00 | |
| 2009/03/03 | INDOJET TRAVEL | | | | R 3,500.00 | |
| 2009/03/03 | INDOJET TRAVEL | | | | R 750.00 | |
| 2009/03/03 | INDOJET TRAVEL | | | | R 300.00 | |
| 2009/03/26 | Air France | | | | R 54,134.00 | |
| | | | $2,943,026.35 | £21,544.27 | R 3,290,403.53 | € 274,075.00 |
| | | | $1.0000 | $1.6411 | $0.1242 | $1.3971 |
| USD VALUE | | | $3,769,960.95 | | | |

A-14