UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                            :

UNITED STATES OF AMERICA          :
                                            :

              v.                     :      16 CR 627 (NGG)
                                            :

SAMUEL MEBIAME               :
                                            :
------------------------------------------------------------X

## REPLY SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF SAMUEL MEBIAME

Larry H. Krantz, Esq.
Wendy Gerstmann Powell, Esq.
**Krantz & Berman LLP**
747 Third Avenue, 32nd Floor
New York, NY 10017-2803
(212) 661-0009

*Attorneys for Samuel Mebiame*

## **Table of Contents**

Preliminary Statement ..................................................................................................1

    A.  The Government Seeks Unfairly to Deprive Mr. Mebiame of Credit for
        His Voluntary Interviews with the Government in 2015 and his Voluntary
        Return to the U.S. in 2016 ..........................................................................2

          1.  Mr. Mebiame's Two Voluntary Interviews in 2015 .......................................3

          2.  Mr. Mebiame's Voluntary Return to the U.S. in 2016 ..................5

    B.  The Government Unfairly Maligns Mr. Mebiame's Character ........................8

    C.  The Government Exaggerates Mr. Mebiame's Culpability so as to Analogize
        Him to Others Receiving the Very Harshest Sentences for FCPA Violations ................10

    D.  The Government Seeks to Deprive Mr. Mebiame of Credit for any of the
        Additional Sentencing Factors Cited in Our Sentencing Memorandum ........................16

Conclusion ................................................................................................17

## **Preliminary Statement**

This reply memorandum is respectfully submitted on behalf of Samuel Mebiame, who is scheduled to be sentenced on May 31, 2017.

In our initial sentencing memorandum we respectfully urged the Court to impose a sentence of time-served, which is the approximate equivalent of a sentence of a year and a day (given Mr. Mebiame's now almost 10 months of incarceration at the MDC).  We provided the Court with nine principal reasons for why such a sentence was justified under 18 U.S.C. § 3553, including (1) Mr. Mebiame's voluntary pre-arrest meetings with the Government, which provided the Government with its main evidence against Mr. Mebiame, as well as broader factual context for its investigation; (2) the sudden and difficult circumstances of Mr. Mebiame's arrest, which stemmed from his voluntary return to the U.S., and resulted in him being arrested and detained – unexpectedly – thousands of miles from home; (3) Mr. Mebiame's early plea, which saved the Government from having to present the case for indictment or engage in Rule 16 discovery; (4) the fact that Mr. Mebiame is the only person to be prosecuted in connection with Och-Ziff's sprawling scheme to bribe foreign officials, and that any sentence must be proportionate to the likely sentences that would be imposed on those far more culpable than Mr. Mebiame (should they ever be prosecuted); (5) the draconian nature of the advisory sentencing guidelines in a case such as this; (6) the need to avoid sentencing disparities among defendants convicted of FCPA violations in analogous cases, whose sentences are often well below the applicable guidelines ranges; (7) the fact that, as a foreign national, Mr. Mebiame will be treated more harshly and serve additional prison time, as compared to defendants who are U.S. citizens; (8) the effect that further incarceration will have on Mr. Mebiame's young daughter; and (9) Mr. Mebiame's otherwise good character and history of good deeds.

Faced with these compelling factors supporting a sentence of time served – or at least a sentence substantially below the statutory maximum of 60 months – the Government resorts to an over-the-top sentencing memorandum that advocates for the longest possible sentence available to the Court – 60 months.  In so arguing, the Government *overstates* Mr. Mebiame's general culpability, and *minimizes* the import of Mr. Mebiame's voluntary meetings with the Government. In essence, the Government's sentencing memo (a) seeks unfairly to deprive Mr. Mebiame of all credit for his voluntary meetings with the Government in 2015 and his voluntary return to the United States in 2016; (b) unfairly assails Mr. Mebiame's character by suggesting, without basis, that his entire life has been marked by corruption; (c) exaggerates his culpability so as to suggest he is analogous to those few individuals who have received the harshest punishments in FCPA cases; and (d) seeks to deprive him of all credit for pleading guilty pre-indictment or for any good deeds he has accomplished in his life.  We trust that the Court will see through the Government's vitriol and hyperbole, and will impose a sentence that is fair, measured and just.  We respectfully submit that such a sentence should be time served, or an alternative sentence that is still well below the statutory maximum.

### A. The Government Seeks Unfairly to Deprive Mr. Mebiame of Credit for His Voluntary Interviews with the Government in 2015 and his Voluntary Return to the U.S. in 2016

As detailed in our sentencing memorandum, in June 2015 – a year before both his arrest and the Och-Ziff resolution – Mr. Mebiame voluntarily met *twice* with the Government to discuss the allegations at issue.  One meeting took place at the Miami airport where he was stopped by agents while entering the country, and the second (more extensive) interview took place days later when Mr. Mebiame traveled voluntarily to the USAO in the EDNY.  At those uncounseled meetings – in which Mr. Mebiame participated due to his utter lack of sophistication as to U.S. law or law enforcement tactics – Mr. Mebiame both incriminated himself and provided

information that was of value to the Government's investigation.   Following those meetings, Mr. Mebiame was permitted to leave the country and travel home.[1]  Subsequently, in July 2016, Mr. Mebiame notified the Government that he was returning to the U.S., and that he wanted to meet again to share additional information.  This meeting ultimately took place on August 16, 2016.  At that point, unbeknownst to Mr. Mebiame, he was what would colloquially be called "low hanging fruit," and was arrested and charged.[2]

In our sentencing memo we argued that the sentence Your Honor imposes should reflect, under 18 U.S.C. § 3553, the fact that Mr. Mebiame engaged in two lengthy meetings in which he voluntary provided useful information to the Government, and voluntarily returned to the United States to meet again with the Government. In response, the Government seeks to minimize these facts by "spinning" what transpired, and effectively denying Mr. Mebiame the sentencing credit he deserves under section 3553(a)(1).

### 1.  Mr. Mebiame's Two Voluntary Interviews in 2015

As to Mr. Mebiame's voluntary interviews in June 2015, the Government concedes that Mr. Mebiame participated in these meetings, and that he inculpated himself.  Indeed, the Complaint filed in this case is rife with references to these inculpatory statements. Having relied extensively on the truth of Mr. Mebiame's inculpatory statements, the Government now tries to

---

[1]      It is obvious that the Government had no intention of charging Mr. Mebiame at that time, as it would never have permitted him to leave the country if that were the case.  Of course, the Government now spins this decision as having been made solely because Mr. Mebiame "promised to continue to cooperate with the government's investigation,"  Govt. Sentencing Memo at p. 6, but surely if the Government had planned to prosecute Mr. Mebiame at that time he would have been arrested then and there. Rather, it is clear that the Government *believed* Mr. Mebiame's statements at the June 2015 meetings, and *trusted* him to provide additional information – conclusions from which it now seeks to distance itself.

[2]      Although by that time Mr. Mebiame had hired U.S. counsel, he was not a criminal lawyer.

"have its cake and eat it too" by creating the misleading impression that during the bulk of these interviews Mr. Mebiame "lied" to the Government and "minimized" his criminal conduct.  Govt. Sent. Memo at p. 17.  Indeed, the Government only grudgingly admits that Mr. Mebiame provided valuable information at all, relegating this concession to a tepid footnote in which it states that Mr. Mebiame's information was "useful to help place the documentary trail of corruption . . . into context."  Govt. Sent. Memo at p. 17, fn. 13.  The Government's characterization of these interviews is inaccurate for at least two reasons.

**First**, the Government itself acknowledges in that same footnote that one of the reasons *it* offered Mr. Mebiame a favorable plea offer was *because* of the useful information he provided.  As it states:  "The Government took this benefit [of useful information] into account when it offered the defendant a plea agreement, which allowed him to plead to a single count information with a five-year statutory maximum sentence."  *Id.*  Surely, given that the Government concedes that Mr. Mebiame provided *truthful* information to it, and further concedes that the *value* of this information was sufficient for the Government to take it into consideration in making its plea offer, it is disingenuous for it to now minimize that information, challenge Mr. Mebiame's truthfulness and argue that *the Court* should not take this factor into account in sentencing Mr. Mebiame.  Simply put, the Government cannot have it both ways.

**Second**, the inaccuracy of the Government's "spin" with respect to Mr. Mebiame's truthfulness at these meetings is made clear from the reports of Mr. Mebiame's interviews, which were recently produced to the defense. at its request, following receipt of the Government's sentencing memo.  Significantly, despite the fact that those two reports comprise approximately 16 single spaced pages, *there is not a single reference to an exculpatory statement by Mr. Mebiame, a lie by Mr. Mebiame, or even any statement denying culpability.*  Rather, these reports

detail – page after page –the valuable information that Mr. Mebiame provided.  Given the absence

of *any* reference to exculpatory or minimizing statements by Mr. Mebiame in these reports, one

must question whether the Government's sentencing memo fairly emphasizes the degree to which

this occurred.  To be clear, we accept as true the Government's statement that Mr. Mebiame may

have at first engaged in some minimization at these interviews (which is commonplace), but we

do challenge the manner in which the Government has chosen to emphasize that fact unfairly in

its sentencing memorandum, so as to deny Mr. Mebiame sentencing credit for the far greater

truthful aspects of his interviews.  Of course, the fact that the Government permitted Mr. Mebiame

to leave the country and travel home at the conclusion of these interviews, because he "appeared

fully cooperative with the government's investigation," Govt. Sentencing memo at p. 6, speaks

volumes as to the tenor of what actually transpired at these meetings.  Indeed, had Mr. Mebiame

become a full-fledged cooperating witness and testified at the trial of another, one can only imagine

the different emphasis that the Government would have adopted as to his degree of truthfulness

versus minimization at these meetings.  We trust that the Court's vast experience will allow it to

recognize spin when it sees it.

### 2.  Mr. Mebiame's Voluntary Return to the U.S. in 2016

The Government also seeks to deny Mr. Mebiame any sentencing credit for his voluntary

decision to return to the U.S. to meet with the Government yet again.  In its effort to deny this

credit, however, the Government misstates the facts.

Specifically, the Government alleges that it independently learned on July 27, 2016, that

Mr. Mebiame had booked travel to the U.S., and that only later that day did Mr. Mebiame call an

IRS agent to say that "he had been collecting relevant documents to show the government."  Govt.

Sent. Memo at p. 7.   The Government then continues its negative spin by complaining that Mr.

Mebiame did not contact the Government again until his counsel called on August 8, 2016, "more

than a week after Mebiame arrived in Miami." *Id.*  However, the Government's recitation of the facts is erroneous.

In fact, another report recently produced by the Government (at the defense request) documents a phone interview of Mr. Mebiame by IRS agent Yves Hunziker, *on July 5, 2016, three weeks before the Government claims to have learned independently about Mr. Mebiame's intended travel to the U.S.*  As that report, states:

> Mr. Mebiame called from Paris.  He will fly to Gabon tomorrow evening. . . . Since last meeting with the U.S. Government Mebiame collected documents and asked foreign officials for approval to talk to [the Government].  Mebiame would like to speak with the U.S. Government and make some clarifications from the [documents he has] reviewed. . . . Mebiame plans to fly to the U.S. in the next 10-14 days and will notify [the Special Agent] of the date.  Mebiame intends to bring U.S. legal representation to the meeting.  Mebiame stated that some of his partners were nervous of his plans to travel to the U.S.  Mebiame believes he has nothing to hide and it's his partners who should be concerned about travel to the U.S.

Thus, this report created *by the Government* make clear that Mr. Mebiame *did voluntarily* contact the Government, *did voluntarily* disclose his plans to travel to the United States, and *did so* before the Government learned of his travel plans.  Not only does this speak volumes as to Mr. Mebiame's character, and the history between him and the Government, but it also lays bare the Government's efforts now to minimize this conduct.

This chronology is also confirmed by Mr. Mebiame's text messages with the IRS agent,[3] which show that on July 5, 2016 -- the same day as the report discussed above – Mr. Mebiame texted the IRS agent (whom he mistakenly refers to as Steve) and stated: "Hi Steeve (sic), we met

---

[3] These text messages and e-mails were provided to the defense, after the Government submitted its sentencing memo, by a French attorney, Eric Moutet, who is a friend of Mr. Mebiame's, and submitted a sentencing letter on his behalf.  Mr. Moutet received them from a family member of Mr. Mebiame's, who is in possession of Mr. Mebiame's cell phone.  We have redacted identifying numbers from these documents.

in Miami and at the DOG (sic) office in NY regarding various affairs that happened in Africa.  I am trying to make contact in order to meet you and the fbi again." *See* Exhibit A.   This text led to the phone call recited above.

Mr. Mebiame's communication and contact with the Government did not end there. Rather, on July 27, 2016 and August 1, 2016, the IRS agent and Mr. Mebiame exchanged additional texts about setting up the meeting in New York.   At that time, Mr. Mebiame also informed the agent that he (Mebiame) had a problem with lost luggage.  *See* Exhibit A hereto.[4]   He also provided the agent, by e-mail on July 27, 2016, with confirmation of the receipt of his Visa for travel to the U.S.  *Id.*   Finally, on August 4, 2016, the IRS agent e-mailed Mr. Mebiame saying: "Let me know when you are available to meet.  I was hoping it would be this week.  Can you meet Monday or Tuesday next week?" *Id.*   Ultimately, the meeting took place on August 16, 2016.

As can be seen from the above, the Government's recitation of the events leading to Mr. Mebiame's return to the U.S. in 2016 is simply incorrect when it ignores completely Mr. Mebiame's voluntary interaction with the IRS agent in early July 2016, and claims (incorrectly) that Mr. Mebiame contacted the Government only *after* the Government independently learned of Mr. Mebiame's intent to travel to the United States.  *See* Govt. Sent. Memo., at pp. 6-7.   In point of fact, Mr. Mebiame gave the Government several weeks' notice of his trip, for the express purpose of setting up a further meeting with them.  While it is true that in addition to his planned meeting with the Government he was going "on holiday" during that trip (and hence the presence of his young daughter), the simple fact is that the trip had a dual purpose.   Thus, the Government's

---

[4] Thus, the Government's suggestion that it learned of the lost luggage issue for the first time when Mr. Mebiame arrived in New York to talk to the Government on August 16, 2016, Govt. Sentencing Memo at p. 7, is also in error.

suggestions that Mr. Mebiame deserves no credit for his return to the U.S. because the Government knew of his trip before Mr. Mebiame contacted them, or because Mr. Mebiame was merely coming to the U.S. for vacation and believed he could "schmooze" his way out of any problem with law enforcement, Govt. Sent. Memo, p. 18, are inaccurate and unfair.[5]

In sum, despite the Government's arguments to the contrary, the circumstances leading up to Mr. Mebiame's arrest – including his two voluntary interviews with the Government, and his continuing voluntary communication with the IRS agent and travel to the U.S. to meet with the Government – reflects admirably on Mr. Mebiame's history and characteristics, and also entitle Mr. Mebiame for sentencing credit for having provided the Government with truthful and useful information.

### B.  The Government Unfairly Maligns Mr. Mebiame's Character

In its zeal to obtain a significant FCPA sentence in this matter, the Government presents a cartoon image version of Mr. Mebiame, using his privileged early years against him, and depicting him as a person with no redeeming qualities, who has made corruption a "way of life."  Govt. Sent. Mem. at p. 1.  This cartoon image is inaccurate, misleading and unfair.

The reality is that Mr. Mebiame has spent his entire adult life working as a businessman, and at times an official of the government of Gabon.  It is true that through his upbringing (as the son of the former Prime Minister of Gabon) he was well positioned to forge relationships with various government officials and other businesspeople in Africa.  This unique vantage point has allowed him to work for years as a consultant in Africa, for businesses seeking opportunities there, and also to provide for the less fortunate in Africa (as discussed in our opening sentencing

---

[5]     Moreover, the Government's further complaint that it took Mr. Mebiame a year to come back is also unfounded, since there was no agreed upon timetable for his return, and in the intervening year both his father and his uncle passed away, delaying his efforts and his travel.

memorandum).  *The vast bulk of Mr. Mebiame's work for years involved entirely legitimate business transactions, and had nothing to do with violations of the FCPA.*

In fact, Mr. Mebiame started his business career in approximately 2000, as a Director of a company formed by his father.  That company engaged in the import-export business from Gabon.  He began consulting on his own in approximately 2003, working together with PetroSA, South Africa's national oil company.  Mr. Mebiame introduced that company to officials from Equatorial Guinea, in a successful effort to conduct business there.  Following his consulting for PetroSA, Mr. Mebiame became a consultant for DeBeers, the world renowned diamond mining company, which was trying to do business in the Central African Republic.  In that capacity, and working from South Africa, Mr. Mebiame met with various government leaders, including the President of the Central African Republic.[6] Following his consulting work for DeBeers, in approximately 2005, Mr. Mebiame worked as a consultant on behalf of the Central African Government, arranging communications with the government of South Africa.  In that capacity, Mr. Mebiame met with former South African President Nelson Mandela.

Starting in approximately 2007, Mr. Mebiame began consulting for the South African joint venture at issue in the Ochs-Ziff investigation (the "Joint Venture").  In that capacity, Mr. Mebiame attempted to facilitate business transactions in Chad, Niger and Guinea, on behalf of the Joint Venture.

While these transactions – which span roughly 5 years – are the subject of the instant charges, it is critical to note is that *much of Mr. Mebiame's work in connection with those transactions was entirely legitimate.*  Specifically, Mr. Mebiame was able to use his government

---

[6]     The PSR, at par. 53, erroneously describes Mr. Mebiame's work for DeBeers as relating to "oil industry matters," but this is an error.  It was PetroSA that was in the oil industry.

and business connections to make key introductions on behalf of the Joint Venture, and to facilitate legitimate business communications.  It is also worth noting that the identity of Ochs-Ziff, as standing behind the Joint Venture, was completely unknown to Mr. Mebiame.  Rather, he understood the Joint Venure to be a South African entity.

During the same time period that he was consulting for the Joint Venture, Mr. Mebiame also worked on behalf of the government of Gabon, essentially working to improve relations between Gabon and South Africa.  He was appointed as an official advisor to the Minister of the Interior, and in that capacity he went on many missions where he had high-level discussions with South African government officials, on behalf of Gabon.

In short, the Government's characterization that Mr. Mebiame "never had a real job" Govt. Sent. Mem. at p. 14, and that he made "corruption a way of life," Govt. Sent. Memo at p. 16, are unfair and unfounded.

Equally unfair is the fact that Mr. Mebiame – solely as a result of his own lack of sophistication about U.S. law and U.S. law enforcement – stands as the only person to have been prosecuted arising out of the Government's multi-year investigation of Ochs-Ziff.  *See* Mebiame Sent. Mem. at pp. 9-13.  Indeed, Mr. Mebiame was plainly a minor player in the larger the Och-Ziff scheme, which – according to the Government – involved over $200 million in bribes, predominantly in African countries with no connection whatsoever to Mr. Mebiame.

### C.  The Government Exaggerates Mr. Mebiame's Culpability so as to Analogize Him to Others Receiving the Very Harshest Sentences for FCPA Violations

As discussed in our sentencing memorandum, Mr. Mebiame's sentence should be consistent with the clear trend in FCPA cases wherein courts impose sentences far below the advisory Guidelines range, and far below the sentences sought by the Government.  *See* Mebiame Sent. Mem. pp. 17-20 (citing cases and articles).  Indeed, the cases and sources cited in our opening

10

memorandum make clear that in FCPA cases courts *often* impose sentences *vastly lower* than the advisory guidelines suggest, and they do so *notwithstanding requests for longer sentences from the Government.*  In fact, the sentences cited in our opening memorandum reflect such sentences, and reflect sentences imposed notwithstanding the Government's request for a substantially higher sentence – sometimes several multiples of the sentences imposed by the courts.

In addition, we would like to bring two additional local, recent FCPA cases to the Court's attention:

- *United States v. Yan*, 15-CR-0706 (S.D.N.Y.) (Broderick, J.): the defendant was sentenced to 2 years' imprisonment, __*notwithstanding the request by the Government for a sentence between 70-87 months under the Guidelines*__.[7]  In that case, the Government maintained that it is "difficult to overstate the severity of what the defendant did: repeatedly bribing an ambassador and the elected President of the United Nations General Assembly, for more than a year, in multiple ways, for multiple purposes." *Id*. at p. 10.  According to the Government, the defendant "both originated and executed" the bribery scheme, *id*. at p. 13, and "did not commit bribery hesitantly, fleetingly, or in a small amount.  She committed bribery for more than a year, in massive amounts, without any apparent hesitation, seeking to corrupt the UN's and Antigua's decision making with respect to multiple matters, including Antigua's selection of a company for a security-related contract," and also received two diplomatic positions as a result of the bribery scheme. *Id*. at p. 12.

- *United States v. Garth Peterson*, 12-CR-224 (E.D.N.Y.) (Weinstein, J.): the defendant was sentenced to 9 months' imprisonment __*notwithstanding the request by the Government for a sentence of at least 51 month's imprisonment*__.[8]  In that case, according to the Government's sentencing memorandum, the defendant was Managing Director in Morgan Stanley's Shanghai China office, wherein he "corrupted an official of the Chinese Government," and "stole a $7 million piece of a building and gave a Chinese public official a piece worth more than $3 million," *Id*. at pp. 13-14, to corrupt that official, notwithstanding that he defendant had been trained "more than half a dozen times" in FCPA compliance matters, and received "at least 35 FCPA compliance reminders."  *Id*. at pp. 5-6.

---

[7]     Govt. Sentencing Memorandum, available on Pacer, document #227, filed July 19, 2016.

[8]     Govt. Sentencing Memorandum, available on Pacer, document #18, filed on August 13, 2012.

These cases, and those cited in our opening memorandum, evidence the courts' determinations that that the Sentencing Guidelines are a poor advisory tool in FCPA cases, and that courts must look past the Government's steadfast institutional commitment to recommending sentences within the Guidelines range in FCPA cases.

In response to the laundry list of cases that reflect this trend and support Mr. Mebiame's argument under 18 U.S.C. § 3553, the Government states only that "in many of the cases, the conduct of the defendants did not rise to the level of Mebiame's criminal conduct." Govt. Sent. Mem., at p. 20.  This, however, is not borne out by the facts.  Indeed, the cases cited in our opening sentencing memorandum refer to cases as serious, or more serious, than the present case, including:

- Sentences of 6 months of imprisonment for two defendants who personally obtained $13 million of business, and whose guidelines ranges were 360 months, and 235-293 months, respectively;

- A sentence of time serve was imposed notwithstanding an advisory range of 108-135 months;

- A sentence of 16 months of imprisonment for a defendant whose guidelines range was 168-210 months (which the Government sought at sentencing);

- A sentence of 9 months of imprisonment imposed for a defendant who earned $2.5 million from a foreign bribery scheme;

- A sentence of 1 year and 1 day for a defendant whose advisory range was 120 months, and who engaged in "one of the most audacious and most corrupt investment schemes ever attempted in the former Soviet Union" involving over $11 million in bribes;

- Sentences of 2 years of probation, and 1 year and 1 day for defendants involved in a scheme that caused a corporate defendant to pay a $17.1 million penalty for a 10-year long conspiracy; and

- A sentence of 1 year and 1 day for a defendant involved in $6 million of bribes for an asset worth $387 million.

Thus, the Government errs in its attempt to brush aside these cases.  These cases (and the others cited in our sentencing memorandum) reflect the heartland of sentences imposed in FCPA cases, and demonstrate that a more significant sentence in this case would create an unwarranted sentencing disparity.

12

Finally, the handful of cases cited by the Government in its sentencing memorandum do not undermine the clear trend discussed above, or the call for a non-guidelines sentence in this case.   In fact, the Government has glossed over this clear trend and cited a handful of outlier sentences which – at the time they were imposed – were touted by the Government as "the longest ever imposed for violating the FCPA."  These cases clearly do not reflect the heartland of cases, and are not useful in determining whether Mr. Mebiame's sentence would be disparate from similarly situated defendants.  For example, the Government refers to *United States v. Jumet*, 09-CR-397 (E.D. Va.) wherein the defendant was sentenced to 87 months imprisonment, at the low end of the advisory guidelines in that case, which range included an increase for obstruction of justice.[9]  At the time this sentence was imposed in 2010, the Government touted this as "the longest ever imposed for violating the FCPA."[10] Similarly, the Government refers to *United States v. Equenazi and Rodriguez*, wherein 15 year and 7 year sentences were imposed respectively after trial for a president and vice-president of a company for their roles in FCPA bribery and money laundering.  Again, at the time the sentence was imposed, the Government touted these sentences as "the longest sentence ever imposed in an FCPA case." [11]  In fact, in its press release the Government acknowledged that the sentence reflected the "sophisticated" manner in which the defendants – the president and executive vice president of a company – devised and carried out a scheme to launder funds, and the fact that the defendants had been convicted after a trial of "one

---

[9]     In reality, the defendant was sentenced to 60 months imprisonment for violating 18 U.S.C. 37a, and a consecutive term of 27 months for violating 18 U.S.C. § 1001.

[10]     https://www.justice.gov/opa/pr/virginia-resident-sentenced-87-months-prison-bribing-foreign-government-officials

[11]     https://www.justice.gov/opa/pr/executive-sentenced-15-years-prison-scheme-bribe-officials-state-owned-telecommunications

count of conspiracy to violate the FCPA and wire fraud; seven counts of FCPA violations; one count of money laundering conspiracy; and 12 counts of money laundering." *Id*.

Thus, as evidenced by the Government's own press releases, the cases relied upon by the Government here were cherry picked sentences which were the "longest sentences ever imposed." Surely these are not the benchmarks against which Congress intended disparate sentences to be measured. Moreover, the Government's reliance on these cases is also misplaced as they reflect longer sentences imposed for much more significant conduct than that engaged in by Mr. Mebiame.[12]

Similarly, the Government's reliance on *United States v. Chinea and Demeneses*, 14-CR-240 (S.D.N.Y.) is misplaced – and actually supports Mr. Mebiame's arguments. In that case, the defendants – the CEO and managing director of a broker-dealer – were each sentenced to 48 months imprisonment for their role in bribing Venezuelan officials for the benefit of an American broker-dealer to the tune of **$60 million**.[13] The advisory guidelines range in that case was **262-367 months imprisonment,** and the Government requested a sentence of 60 months, the maximum permitted under 18 U.S.C. § 371.[14] Put simply, the fact that these two masterminds and executive officers – whose advisory guidelines ranges were ***double*** Mr. Mebiame's advisory

---

[12]     As stated above, the sentences imposed in *United States v. Equenazi and Rodriguez*, reflected the multiple counts of money laundering and the extensive scheme undertaken by those two defendants. However, as the Government's press release on this case reflects, another defendant involved in this case – Antonio Perez, 9-CR-20347 (S.D. Fla.) – who was not the mastermind and who was not convicted of any offense involving money laundering, received a much more modest sentence of 24 months (which sentence was later reduced to 10 months under Rule 35).

[13]     https://www.justice.gov/opa/pr/ceo-and-managing-director-us-broker-dealer-sentenced-international-bribery-scheme

[14]     Government's Consolidated Sentencing Memorandum, available on Pacer, document # 35.

guidelines range – were sentenced to 48 months imprisonment supports Mr. Mebiame's request for a significantly lower sentence given that the conduct and position of the defendants stands in stark contrast to Mr. Mebiame's situation where he was a pawn in a much larger scheme for which he did not benefit anywhere near $60 million, and for which it appears that the masterminds will never face criminal charges.  Indeed, the 48 months sentence – which was well under the advisory guidelines and below the Government's request at sentencing – counsels strongly in favor of a significantly lower sentence being imposed in this case, particularly given that these two defendants – both Americans released on bail the same day as their arrests – will serve much less time than the imposed sentences, in conditions and a location much better than Mr. Mebiame will be eligible for as a foreign national.

Similarly, the Government's reliance on *United States v. Granados*, 10-CR-20881 (S.D. Fla.) also supports Mr. Mebiame's argument for a non-guidelines sentence.  In that case, the CEO of an American company was sentenced to 46 months imprisonment for having devised and implemented a foreign bribery scheme to benefit his company.[15]  Notably, not only is this case factually distinguishable from the present case (which counsels in favor of a significantly lower sentence being imposed here), but it is noteworthy that (again) the Court rejected the advisory guidelines range in FCPA cases, and imposed a sentence below that which was sought by the Government, even for a CEO who was the mastermind of a vast scheme. Thus, this case supports rather than undermines Mr. Mebiame's arguments for a much lower sentence of time served.

Accordingly, the cases cited by the Government do not undermine the arguments made in Mr. Mebiame's sentencing memorandum, but rather further support his arguments, and reflect the

---

[15]     https://www.justice.gov/opa/pr/former-ceo-us-telecommunications-company-sentenced-46-months-prison-bribing-foreign

fact that courts faced with FCPA cases routinely impose non-Guidelines sentences, and often impose sentences well below the sentences sought by the Government. [16] Thus, we respectfully renew our request that the Court sentence Mr. Mebiame in a manner consistent with the sentences meted out in these cases.

### D. The Government Seeks to Deprive Mr. Mebiame of Credit for any of the Additional Sentencing Factors Cited in Our Sentencing Memorandum

By seeking a sentence at the statutory maximum of 5 years, the Government implicitly seeks to deny Mr. Mebiame credit for *any* of the other sentencing factors cited in our sentencing memorandum under 18 U.S.C. § 3553. These include the following:

- Despite the white-collar nature of this offense, Mr. Mebiame has been detained at MDC – an institution housing individuals of all security classifications – since his arrest in August 2016. This pre-trial detention has been particularly harsh on Mr. Mebiame, as he is thousands of miles away from his friends and family who have been unable to visit him.

- If sentenced to additional imprisonment, Mr. Mebiame will serve a longer sentence than an American citizen because he is not eligible to serve the last months of his sentence at a half-way house, as would an American citizen.

- If sentenced to additional imprisonment Mr. Mebiame will serve his sentence at a higher security level facility as a foreign national who is subject to deportation.

- Mr. Mebiame exhibited extraordinary acceptance of responsibility by pleading guilty pre-indictment, and even pre-Rule 16 discovery.

- Mr. Mebiame has submitted letters from friends and family documenting the many good deeds he has done in his life, and the loving and caring way he has treated friends and family.

---

[16] In addition, it is notable that in none of the cases cited by the Government was the defendant a foreign national who was the lone person held accountable for a massive scheme which was not of his making, and for which he was not the prime beneficiary.

The Government has not disputed or taken issue with any of these arguments.  Nonetheless, by seeking a sentence at the statutory maximum, the Government essentially asks the Court to ignore them all.  However, these are all wholly appropriate sentencing factors that must be taken into account at sentencing.   Accordingly, we ask that Your Honor take these factors into consideration in determining an appropriate sentence for Mr. Mebiame.

## Conclusion

For the foregoing reasons, we respectfully urge the Court to temper justice with mercy, and to impose a sentence of time served, or an alternative sentence that is significantly below the statutory maximum of five years.


Dated: New York, New York
       May 30, 2017


Respectfully submitted,

/s/
_____
Larry H. Krantz, Esq.
Wendy Gerstmann Powell., Esq.
**Krantz and Berman LLP**
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009
*Attorneys for Defendant Samuel Mebiame*

# EXHIBIT A



Messages (9) ▓▓▓▓▓▓▓   Details

Text Message
Tue 5 Jul, 8:49 pm

Hi Steeve, we met in Miami and at the DOG office in NY regarding various affairs that happened in Africa. I am trying to make contact in order to meet you and fbi again .
Thanks
Samuel MEBIAME

Hi – I can be reached at ▓▓▓▓▓▓▓ Want to talk now?

Ok . Tx . Yes call you now

Just tried call now that number , call was disconnected . I try again



< Messages (9) ▮▮▮▮▮▮  Details

Wed 27 Jul, 4:04 pm

Samy

SAMUEL MEBIAME

Yves.Hunziker@ci.irs.gov

Perfect

Mon 1 Aug, 4:05 pm

Hello – we are available either Wed/ Thurs. What works best for you in Brooklyn, NYC?

Hi Yves ,
My suitcase did not make it Saturday to Miami from Qatar airways , my documents re this case inside

Text Message                    Send

Messages (9) ████████████

Thurs. What works best for you in Brooklyn, NYC?

Hi Yves ,
My suitcase did not make it Saturday to Miami from Qatar airways , my documents re this case inside ..
all business class passengers got theirs except me .
Am waiting 2 pm today for Qatar airways to give me last update as they seem have no clue were it is ..
After that my lawyers will ask airport to run video
Will call you afternoon
Tx
S

 Send

Thread                                1 of 2                    ∧   ∨

Yves Hunziker

**From:** Samuel MEBIAME
[mailto ████████████████████]
**Sent:** Wednesday, July 27, 2016 3:56 PM
**To:** Hunziker Yves D
**Subject:** Fwd: ESTA Document



Begin forwarded message:

**From:** daniela@usa-welcome.com
**Date:** 27 July 2016 at 9:40:42 pm GMT+2
**To:** ████████████████████
**Subject: ESTA Document**



Dear Mr. MEBIAME,

A valid ESTA authorization has been approved
for the applicant in the attached document. The
applicant's passport is now connected with this
ESTA application.

When you arrive to the United States, you will be
requested to present your passport for review.
Your ESTA authorization approval is available to
the authorities in their systems. Please note,
airline carriers often request proof of your
authorization to travel to the United States. We
recommend you print the attached document and



●●●● Airtel                    2:17 am                    28% ▊

< Thread                       1 of 2                         ∨

airline carriers often request proof of your authorization to travel to the United States. We recommend you print the attached document and take with you together with your passport. It is the responsibility of the traveler to check in advance all documentation required by the airline or other carrier.

Please verify the accuracy of your First Name, Last Name, Passport Number and Date of birth on the attached ESTA authorization document. These must match the information on your passport.

The ESTA authorization gives approval in advance, and signifies your eligibility to travel to the United States. All travelers are still required to go through inspection with U.S. Customs and Border Patrol. Final admission into the United States is provided by U.S. Customs at the first port of entry into the United States.

The payment method used for the ESTA application will be charged by EMAX International LLC / USA-WELCOME a total of $74USD which includes the US Government's processing fee of $14USD.

As a reminder, your ESTA is valid for a period of two years unless your passport expires before such time. Please contact us in the future if you

Case 1:16-cr-00627-NGG    Document 29    Filed 05/30/17    Page 26 of 27 PageID #: 256



on the attached ESTA authorization document. These must match the information on your passport.

The ESTA authorization gives approval in advance, and signifies your eligibility to travel to the United States. All travelers are still required to go through inspection with U.S. Customs and Border Patrol. Final admission into the United States is provided by U.S. Customs at the first port of entry into the United States.

The payment method used for the ESTA application will be charged by EMAX International LLC / USA-WELCOME a total of $74USD which includes the US Government's processing fee of $14USD.

As a reminder, your ESTA is valid for a period of two years unless your passport expires before such time. Please contact us in the future if you require additional assistance. We welcome you to the United States and wish you a pleasant stay.


Regards,


Daniela
ESTA Services
Customer Support

From: Hunziker Yves D >                                    Hide

To: Samuel MEBIAME >

## Re: meeting
4 August 2016 at 8:47 pm

Let me know when you are available to meet. I was hoping it would be this week. Can you meet Monday or Tuesday next week?
Thanks,
-Yves